UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Vera Construction, L.L.C., individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>Sika AG; Sika Corporation; Chryso, Inc.; GCP Applied Technologies, Inc.; Compagnie De Saint-Gobain S.A.; Saint-Gobain North America; Master Builders Solutions Admixtures U.S., LLC; Master Builders Solutions Deutschland GmbH; Cinven Ltd.; Cinven, Inc.; The Euclid Chemical Company; RPM International Inc.; And Does 1-10,<br><br>     Defendants. | Case No.: <u>2:23-CV-05135</u><br><br>CLASS ACTION COMPLAINT<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

I.     NATURE OF THE CASE ........................................................................... 1

II.    JURISDICTION AND VENUE .................................................................. 7

III.   PARTIES AND UNNAMED CO-CONSPIRATORS ................................. 7

    A.     Plaintiff .......................................................................................... 7

    B.     Defendants ...................................................................................... 7

        1.     Sika ...................................................................................... 7

        2.     Saint-Gobain Group ............................................................ 8

        3.     Master Builders Group ...................................................... 10

        4.     Euclid Group ...................................................................... 12

        5.     Doe Defendants .................................................................. 13

    C.     Agents and Unnamed Co-Conspirators ........................................ 13

IV.    FACTUAL ALLEGATIONS ..................................................................... 14

    A.     CCAs Add Value to Binding Compounds Like Concrete and Mortar. ................ 14

    B.     Contractors Use Substantial Amounts of Various Kinds of CCA to Improve Concrete and Mortar. ..................................................... 23

        1.     CCAs Comprise a Substantial Market in the Construction Sector. .......... 23

        2.     CCAs and Their Functions .................................................. 26

        3.     Cement Additives ................................................................ 31

        4.     Mortar Admixtures .............................................................. 32

    C.     Global Antitrust Investigations into Defendants' Anticompetitive Conduct ........ 32

    D.     Defendants Effectuated Their Conspiracy Through Their Shared CCA Trade Associations ........................................................ 38

    E.     Defendants' CCA Prices Soared During the Class Period as Defendants Signaled Price Increases ........................................... 45

        1.     Defendants' CCA Prices Have Climbed During the Class Period, Including by Imposing Surcharges ........................... 45

|  | 2. | Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges............................................................. 50 |

|  | 3. | Defendants Have Admitted Normal Market Forces Do Not Explain Their Price Increases or Surcharges........................................ 54 |

| F. | Defendants Have Consolidated Their Control Over CCAs .................................. 57 |

| G. | The Structure and Characteristics of the Market for CCAs Support the Existence of a Conspiracy........................................................................ 64 |

|  | 1. | Defendants Dominate The CCA Market....................................... 64 |

|  | 2. | Barriers to Entry Are High......................................................... 65 |

|  | 3. | Defendants Sell Homogenous Commodity Products................................ 67 |

|  | 4. | CCA Buyers Are Unconcentrated................................................. 71 |

|  | 5. | Demand for CCAs Is Inelastic ..................................................... 71 |

| H. | Defendants Fraudulently Concealed Their Conduct............................................. 73 |

| V. | CLASS ACTION ALLEGATIONS ................................................................. 74 |

| VI. | INTERSTATE TRADE AND COMMERCE ..................................................... 82 |

| VII. | ANTITRUST INJURY ........................................................................... 82 |

| VIII. | CAUSES OF ACTION ........................................................................... 83 |

| IX. | PRAYER FOR RELIEF .......................................................................... 114 |

| X. | JURY DEMAND ................................................................................ 115 |

Plaintiff Vera Construction L.L.C. ("Plaintiff"), individually and on behalf of all others similarly situated (the "Classes," as defined below), upon personal knowledge as to the facts pertaining to itself, and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief, and other relief pursuant to state antitrust, consumer, and unjust enrichment laws, as well as claims for injunctive relief based on federal antitrust laws and demands a trial by jury on all matters so triable.

## I.    NATURE OF THE CASE

1.    In this antitrust case, the Defendants agreed to fix, raise, and maintain the prices of construction specialty chemicals—more specifically, numerous "admixture" chemicals added to concrete and mortar to control their setting and curing, and to improve the final product. Defendants issued a series of price increase notices, citing excuses that do not hold water. Behind the scenes, Defendants discreetly alluded in investor communications to their pricing discipline, a coded phrase potentially supporting their collective price increases.

2.    Supporting their price-fixing, Defendants consolidated their industry with numerous acquisitions in what an industry writer called "a continuing global concrete admixtures transformation."[1] Defendants' consolidation included billion-dollar transactions and numerous smaller acquisitions, which all enhanced their collective market power.

3.    Defendants' secret agreement came to light this fall when European regulatory authorities announced dawn raids and inspected fourteen companies and two trade associations. The European Commission and U.K.'s Competition and Markets Authority ("CMA") issued the first announcements of these inspections, followed by the Turkish Competition Authority. The

---

[1] *Sika Closes Master Builders Deal With Former Chryso Underwriter*, concrete products (June 15, 2023), https://concreteproducts.com/index.php/2023/06/15/sika-closes-master-builders-deal-with-former-chryso-underwriter/ (accessed December 8, 2023).

CMA stated it was in contact with other authorities, including the United States Department of Justice. Thereafter, a U.K. court issued public orders concerning the search warrants it had issued for the investigation.

4.      The CMA's announcement stated it normally published names of targets in an investigation unless such disclosure could prejudice an investigation of CMA or its regulatory partner. CMA declined to release names in that announcement about its investigation. However, before long certain Defendants disclosed that they were cooperating in the investigation, and that contact had been established with the United States Department of Justice.[2]

5.      This lawsuit arises from Defendants' unlawful agreement to fix the prices for: (a) concrete admixtures, (b) cement additives, (c) admixtures for mortar, and (d) products containing or bundled with any of the foregoing (collectively, "CCAs"). CCAs, which can be either in liquid or powdered form, are added to concrete, cement, and mortar before or during the aggregate's mixing with water in order to give the finished product certain qualities, such as reducing the amount of water needed for the aggregate to set, reducing (or increasing) set time, reducing

---

[2] E.g., Tom Brown, *EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation*, ICIS (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-%20antitrust-investigation/ (accessed December 7, 2023) (contact with DOJ); Nicholas Hirst and Lewis Crofts, *Saint-Gobain, Sika, MBS Are Cooperating With Antitrust Probes Into Construction Chemicals (Update)* mlex (Updated Oct. 18, 2023) (Cinven announcement for Master Builders).

shrinkage, stabilizing or preventing cracking, and inhibiting corrosion.[3] Globally, the market for CCAs reached more than \$18 billion in 2020[4] and \$27 billion in 2022.[5]

6.    Defendants Sika AG and Sika Corporation (collectively, "Sika"); Chryso, Inc. ("Chryso") and GCP Applied Technologies, Inc. ("GCP"), under the ownership and control of Compagnie de Saint-Gobain S.A. and Saint-Gobain North America ("Saint-Gobain," and with Chryso and GCP, collectively "Saint-Gobain Group"); Master Builders Solutions Admixtures U.S., LLC, ("MBSA"), under the ownership and control of Master Builders Solutions Deutschland GmbH ("MBSD"), Cinven Ltd., and Cinven, Inc. ("Cinven," collectively "Master Builders Group"); and The Euclid Chemical Company ("Euclid"), under the ownership and control of RPM International Inc. ("RPM," and with Euclid, "Euclid Group")—manufacture and sell the vast majority of CCAs sold in the United States.

7.    Defendants' unlawful agreement caused persons and entities that purchased CCAs other than directly from Defendants in the United States and its territories, including Plaintiff and the Classes, to pay supra-competitive prices for CCAs sold by Defendants in the United States and its territories from the period beginning no later than May 11, 2018 and running through the date on which any Classes herein are certified (the "Class Period"), in violation of Sections 1 and 3 of

---

[3] The Constructor, 15 Types of Admixtures Used in Concrete, https://theconstructor.org/concrete/types-concreteadmixtures/5558/#:~:text=15.%20Coloring%20Admixtures%20%20%20Admixture%20%20,%20%20Green%20%203%20more%20rows%20.
[4] Fortune Business Insights, Concrete Admixtures Market Size (Jan. 2020), https://www.fortunebusinessinsights.com/concrete-admixtures-market-102832.
[5] Global News Wire, Concrete Admixture Market is Projected to reach US \$27.5 Billion with a Share of 36.1%, by 2032 (July 13, 2022), https://www.globenewswire.com/en/newsrelease/2022/07/13/2479255/0/en/Concrete-Admixture-Market-is-projected-toreach-US-27-4-Billion-with-a-Share-of-36-1-by-2032-Future-Market-Insights-Inc.html.

the Sherman Act (15 U.S.C. §§ 1, 3). Defendants' scheme included both price increases and the imposition of surcharges on CCAs sold in the United States.

8.     Plaintiff and the Classes first became aware of Defendants' unlawful scheme on October 17, 2023, when the European Commission ("EC") announced that it had, together with the United Kingdom's Competition and Markets Authority ("CMA") and the Turkish Competition Authority ("TCA"), carried out surprise antitrust inspections (also known as "dawn raids") of "companies active in the construction chemicals sector in several Member States."[6] Both the EC and CMA have confirmed that they are working with the United States Department of Justice's Antitrust Division ("DOJ") in connection with these dawn raids, thus indicating that the anticompetitive conduct in question also extended into this country.[7]

9.     The origins of Defendants' conspiracy can be traced to 2014, when Compagnie de Saint-Gobain S.A. launched an unsuccessful hostile takeover of Sika AG.[8] The alleged conspiracy was born from this attempted merger. At the time it was launched, the market was already highly susceptible to collusion: the supply side was concentrated with high barriers to entry; the demand side was unconcentrated; and the demand for CCAs was inelastic. Sika AG and Compagnie de Saint-Gobain S.A., with their shared financial interest through Compagnie de Saint-Gobain S.A.'s

_____

[6] Press Release, European Comm'n, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061.

[7] Press Release, European Commission, Commission Carries Out Unannounced Antitrust Inspections in the Construction Chemicals Sector (Oct. 17, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_5061; Construction News, Competition Regulators Probe Concrete Additive Firms (Oct. 19, 2023), https://www.constructionnews.co.uk/legal/competition-regulators-probe-concrete-additive-firms-19-10-2023/.

[8] Saint-Gobain Remains Committed to Deal to Take Over Sika, https://www.reuters.com/article/us-sika-cie-saint-gobain-idUSKBN1300II (last updated Nov. 6, 2016).

significant financial stake in Sika AG, leveraged these susceptibilities and agreed to cease competing with one another in order to better ensure they both obtained higher prices for CCAs.

10.     This anticompetitive agreement, however, faced a problem: there were a handful of other, competing manufacturers of CCAs. Because these competitors were a threat to Compagnie de Saint-Gobain S.A. and Sika AG's agreement to charge higher prices for CCAs, the co-conspirators agreed to a joint, worldwide buying spree, ultimately purchasing no fewer than a half-dozen of their shared competitors between 2017 and the present. This agreement was aided and abetted at all times by Cinven, with Euclid Group thereafter joining the conspiracy. As Sika told investors in its 2022 Annual Report, it had "consolidate[d] fragmented [market segments]" to strengthen its core business.[9]

11.     Defendants' agreement became increasingly effective as they consolidated their market power, and prices for CCAs continued to rise. The onset of Covid in 2021, however, supercharged Defendants' conspiracy. With no meaningful check on their pricing power, Defendants agreed to institute (a) price increases on the CCAs, and (b) surcharges on top of those price increases, including shipping surcharges and raw material surcharges.

12.     Defendants have been secure in their knowledge that their competitors—the other Defendants—will not undercut them on price. For example, one industry analyst, in discussing at least the third price increase made by Sika in 2021,[10] stated, "They are not losing sales when in-

---

[9] Sika, Annual Report 2022, 13, https://www.sika.com/dms/get.get/55534c2a-608c-4ec2-bc9f-df21d5ada6bd/glo-ar-2022-sika-business-year.pdf?_gl=1*t666q1*_ga*NTI2NDMwNTU0LjE2OTc2MzU0ODg.*_ga_K04G1QB2XC*MTY5NzgyODQ5Ni43LjEuMTY 5NzgzMTU4OC4wLjAuMA.
[10] Sika Raises Prices to Counter Jump in Raw Material Costs, https://www.reuters.com/article/sika-results-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y (last updated Feb. 22, 2019) (noting price increases in January 2021 and March 2021).

creasing prices because competitors will also not sell at lower prices." [11]Similarly, Frank Sulli-van, the Chairman, President, and CEO of RPM, admitted on an earnings call in July of 2023 that Euclid Group was charging too much for its CCAs but that the company (trusting that it would not be undercut on price) "held our pricing and held our discipline" and, as a result, reaped substantial supra-competitive profits on its CCAs.[12]

13.     Moreover, Defendants' claimed justification for these price hikes and surcharges is pre-textual. The spike in raw material and shipping costs was either non-existent or short lived. In comparison, Defendants' price increases, including surcharges, on CCAs have been both extreme and persistent.

14.     Defendants' conspiracy was facilitated through their shared membership in numerous trade associations, as described in detail in this Complaint.

15.     In sum, beginning no later than May 11, 2018, Defendants entered into an agreement to consolidate their control over the global manufacture of CCAs and charge supra-competitive prices for CCAs through price increases and the imposition of surcharges. This agreement, which was effectuated through Defendants' shared membership in numerous trade associations, resulted in Plaintiff and members of the Classes paying supra-competitive prices for CCAs in the United States and its territories. Through this action, Plaintiff, on behalf of itself and members of the Classes, seeks to recover the overcharges paid, other than directly from the Defendants, for CCAs.

---

[11] Update 2-Chemicals Group Sika Tackles Higher Costs by Raising Prices, https://www.reuters.com/article/sika-results/update-2-chemicals-group-sika-tackles-higher-costs-by-raising-prices-idUSL4N2RI0XW (last updated Oct. 21, 2021).
[12] Q4 2023 RPM International Inc. Earnings Call Transcript (July 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf.

## II.    JURISDICTION AND VENUE

16.    Plaintiff brings this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Classes and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States and its territories for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

18.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## III.    PARTIES AND UNNAMED CO-CONSPIRATORS

### A.    **Plaintiff**

19.    Plaintiff, Vera Construction L.L.C., is a limited liability company registered in the State of Minnesota with its primary place of business in Minneapolis, Minnesota.

20.    During the Class Period, Plaintiff purchased CCAs at supra-competitive prices, other than directly from one or more of the Defendants, and suffered antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

### B.    **Defendants**

#### 1.    *Sika*

21.    Defendant Sika AG is a Swiss corporation with its primary place of business at Zugerstrasse 50 Baar, Zug, 6341 Switzerland. During the Class Period, Sika AG manufactured and

sold CCAs around the World, including in the United States, both directly and through its predecessors, affiliates, and/or subsidiaries, including Defendant Sika Corporation.

22.    Sika AG is a publicly traded corporation that manufactures and sells specialty chemical-based products. Its 33,698 employees produce additives for concrete, cement, and mortar production, among other chemicals. Sika AG garnered US$ 10.9 billion in 2022 revenue.[13] Sika AG's net 2022 sales to the Americas were CHF 3.197 billion, or US$ 3.647 billion.[14]

23.    Defendant Sika Corporation is a New Jersey corporation with its primary place of business at 201 Polito Ave Lyndhurst, New Jersey, 07071. Sika Corporation has approximately thirty-six (36) locations throughout North America, including twenty-eight (28) in the United States and three (3) in this District.[15] During the Class Period, Sika Corporation manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

24.    Sika Corporation is a wholly owned subsidiary of Sika AG. Sika AG controls Sika Corporation both generally and with respect to the conduct of Sika Corporation in furtherance of the unlawful acts alleged in this Complaint.

25.    Sika AG and Sika Corporation are collectively referred to herein as "Sika."

2.    *Saint-Gobain Group*

26.    Defendant Compagnie de Saint-Gobain S.A. is a French corporation with its primary place of business at Tour Saint Gobain,12 Place De L Iris Courbevoie, Ile-De-France,

---

[13] *Sika Group Overview,* PitchBook, https://pitchbook.com/profiles/company/51557-05#overview (accessed December 13, 2023).

[14] Sika Business Year 2022, at 216; Forbes Advisor, https://www.forbes.com/advisor/money-transfer/currency-converter/chf-usd/?amount=3197.7 (accessed December 13, 2023) (current currency rate translation).

[15] SIKA, Locations, https://usa.sika.com/en/about-us/sika-usa-locations.html.

92400 France. During the Class Period, Saint-Gobain Group manufactured and sold CCAs around the world, including in the United States and its territories, both directly and through its predecessors, affiliates, and/or subsidiaries, including Saint-Gobain North America, Chryso, and GCP.

27.    Defendant Saint-Gobain North America is a Pennsylvania corporation with its primary place of business at 20 Moores Rd., Malvern, Pennsylvania, 19355. Saint-Gobain North America has approximately 150 locations throughout North America, including 106 in the United States, four (4) of which are in this District.[16] During the Class Period, Saint-Gobain North America manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

28.    Defendant Chryso, Inc. ("Chryso") is a Michigan corporation with its primary place of business at 1611 Highway 276, Rockwall, TX 75032. With over 1,300 staff worldwide, Chryso has twenty-two (22) foreign subsidiaries and serves customers in more than one hundred (100) countries,[17] including four (4) in the United States.[18] During the Class Period, Chryso manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries. Saint-Gobain acquired Chryso in 2021 for € 1.2 billion.[19]

29.    Defendant GCP Applied Technologies ("GCP") is a Georgia corporation with its primary place of business at 2325 Lakeview Parkway, Suite 450, Alpharetta, GA 30009. GCP employs roughly 2,400 people in more than 40 countries, serving customers in more than 110

---

[16] Saint-Gobain, Manufacturing Sites, https://www.saint-gobain-northamerica.com/manufacturing-sites.
[17] Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.
[18] CHRYSO, Inc. LinkedIn Profile, https://www.linkedin.com/company/chryso-inc/about/.
[19] *Saint-Gobain Acquires Chryso*, global cement (Oct. 4, 2021), https://globalcement.com/news/item/13080-saint-gobain-acquires-chryso (accessed December 13, 2023).

countries, including in the United States.[20] During the Class Period, GCP manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries. GCP announced in December 2021 that Saint-Gobain was acquiring it for about US$ 2.3 billion.[21]

30.     Saint-Gobain North America, Chryso, and GCP are wholly owned subsidiaries of Compagnie de Saint-Gobain S.A., which controls Saint Gobain North America, Chryso, and GCP both generally and with respect to their conduct in furtherance of the unlawful acts alleged in this Complaint.

31.     Compagnie de Saint-Gobain S.A., Saint-Gobain North America, Chryso, Inc., and GCP Applied Technologies, Inc. are collectively referred to herein as "Saint-Gobain Group."

### 3.     Master Builders Group

32.     Defendant Cinven Ltd. is a British corporation with its primary place of business at 21 St. James's Square, London, SW1Y 4JZ, United Kingdom. Cinven Ltd. manufactures and sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including Cinven, Inc., MBSD, and MBSA.

33.     Cinven Ltd., owns and operates businesses in the United States. Its U.S. subsidiaries include Brabeion Software Corp., Meteorite Merger Sub inc., Viachem Ltd. (Tx), Ingredients Inc., BioAgilytix Labs LLC, Tractel Inc., Safety Products Group LLC, Bluewater Manufacturing, LLC, Comfort-N-Mobility Inc., Delta Accessibility LLC, Hudson Seating & Mobility, Travis Medical Sales Corp., and TaxAct Inc.[22] For example, Cinven announced in 2022 that it agreed to acquire

---

20 GCP Applied Technologies, Locations, https://ca.gcpat.com/en/about/locations.
21 *Chryso, CertainTeed Parent Saint-Gobain to Acquire GCP*, CementProducts (Dec. 6, 2021), https://concreteproducts.com/index.php/2021/12/06/chryso-certainteed-parent-saint-gobain-to-acquire-gcp/ (accessed December 8, 2023).
22 Bloomberg, Company Report – Cinven Ltd. 13 – 19 (Dec. 7, 2023).

TaxAct for US$ 720 million and would bring it together with its Drake Software, which provided tax preparation software for over 70,000 tax offices "throughout the U.S."[23]

34.    Cinven Ltd., manages investments for a substantial number of U.S. investors. For example, in 2016, the staff of the Pennsylvania Public School Employees' Retirement System recommended that the pension fund invest up to € 100 million to the Sixth Cinven Fund, L.P. The pension fund had previously committed € 150 million to the Fourth Cinven Fund and committed € 100 million in 2012 to the Fifth Cinven Fund.[24]

35.    Defendant Cinven, Inc. is a New York corporation with its primary place of business at Tower 49, 12 East 49th Street, New York, NY 10017.[25] Cinven Inc. manufactures and sells CCAs around the World, including in the United States and its territories, through its predecessors, affiliates, or subsidiaries, including MBSA. Defendants Cinven Ltd. and Cinven Inc. are collectively referred to herein as "Cinven."

36.    Defendant Master Builders Solutions Deutschland GmbH ("MBSD") is a German corporation with its primary place of business at Glücksteinallee 43-45, 68163 Mannheim, Germany. During the Class Period, MBSD manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including MBSA. Indeed, the CEO of MBSA, Borris Gorella, is the Managing Director of MBSD's parent company, Master Builders Solutions Holdings GmbH. MBSD states its over 1,500 staff members "develop, produce, and market high-quality chemical

---

[23] *Cinven to Acquire TaxAct*, Drake Software (Nov. 1, 2022), https://www.drakesoftware.com/about-us/drake-news/cinven-to-acquire-taxact/ (accessed December 7, 2023).

[24] Darren C. Foreman, Public Investment Memorandum, Sixth Cinven Fund, L.P. (Feb. 12, 2016), https://www.psers.pa.gov/About/Board/Resolutions/Documents/2016/res09.pdf (accessed December 7, 2023).

[25] Cinven, Locations, https://www.cinven.com/site-tools/cinven-offices

admixtures, cement adhesives and underground technologies to master the challenges of today and tomorrow." Its specialties include concrete admixtures, sustainable concrete, and admixtures, concrete, and concrete repair. It has locations in Beachwood, Ohio, and Kingman, Kansas.[26]

Defendant Master Builders Solutions Admixtures U.S., LLC ("MBSA") is a Delaware corporation with its primary place of business at 23700 Chagrin Blvd., Beachwood, Ohio, 44122. MBSA has approximately three (3) locations throughout North America, including two (2) in the United States.[27] During the Class Period, MBSA manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

37.    MBSD and MBSA are wholly owned subsidiaries of Cinven. Cinven controls MBSD and MBSA both generally and with respect to the conduct of MBSD and MBSA in furtherance of the unlawful acts alleged in this Complaint.

38.    MBSD, MBSA, and Cinven are collectively referred to herein as "Master Builders Group."

### 4.    *Euclid Group*

39.    Defendant The Euclid Chemical Company ("Euclid") is an Ohio corporation with its primary place of business at 19215 Redwood Rd, Cleveland, Ohio 44110. Euclid has approximately twenty-eight (28) locations in North America, including twenty-one (21) locations in the United States, one of which is in this District.[28] During the Class Period, Euclid manufactured and sold CCAs in the United States and its territories, directly and/or through its predecessors, affiliates, or subsidiaries.

---

[26] *Master Builders Solutions*, LinkedIn, https://www.linkedin.com/company/master-builders-solutions- (accessed December 7, 2023).

[27] Master Builders Solutions, Our Locations, https://www.master-builders-solutions.com/about-us/our-locations

[28] The Euclid Group, Locations, http://12.43.214.238/locations.

40.     Defendant RPM International ("RPM") is a Delaware corporation with its primary place of business at 2628 Pearl Road, Medina, Ohio 44256. During the Class Period, RPM manufactured and sold CCAs around the World, including in the United States and its territories, both directly and through its predecessors, affiliates, or subsidiaries, including Euclid. RPM has a market capitalization of US$ 13.8 billion, and its FY 2022 revenue was US$ 6.7 billion.

41.     Euclid is a wholly owned subsidiary of RPM. RPM controls Euclid both generally and with respect to the conduct of Euclid in furtherance of the unlawful acts alleged in this Complaint.

42.     Euclid and RPM are collectively referred to herein as "Euclid Group."

### 5.    *Doe Defendants*

43.     Doe Defendants 1-10 are members of the price-fixing conspiracy alleged herein whose identities are presently unknown to Plaintiff. These include, among other entities, the various "industry bodies" referenced in the CMA's statement regarding its investigation. Plaintiff expects that the identity of these Doe Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend its complaint to add those entities in place of the Doe Defendants.

### C.    <u>Agents and Unnamed Co-Conspirators</u>

44.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents. To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant(s), it nevertheless retained the power to assert control over the subsidiary if the latter failed to act in the parent's interests. The subsidiaries played a critical role

in the conspiracy in that they (as well as most parent Defendants) sold price-fixed CCAs and products derived from them to direct purchasers in the United States.

45.    When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their corporate families. As a result, the entire corporate family was represented at any such meetings and discussions by its agents and was a party to the agreements reached by them.

46.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

47.    Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## IV.    FACTUAL ALLEGATIONS

### A.    CCAs Add Value to Binding Compounds Like Concrete and Mortar.

48.    Concrete Admixtures (CCAs) are chemicals added to a mix of ingredients for a bonding compound such as concrete or mortar to affect the finished product's workability, eventual water resistance, and other characteristics. CCAs can also increase control over the timing of the concrete's setting or curing. Timing of their curing is important because pouring and curing must successfully relate to the timing of other aspects of the project for which the concrete is used.[29]

---

[29] *Concrete Admixtures*, ConcreteNetwork.com (Nov. 3, 2020),
https://www.concretenetwork.com/concrete/concrete_admixtures/ (accessed December 4, 2023);

49.     CCAs can also be added to cement or mortar, for similar effects. Cement, also called Portland cement, is used to make concrete and mortar. The name Portland cement came from cement's inventor, a mason named Joseph Apdin, who compared cement's color to that of stone from quarries on an English island named Portland.

50.     Mortar is a mixture of powdered cement, fine sands, lime, and water. Lacking concrete's strength, mortar is used as a "glue" to hold bricks, stone, concrete blocks, or other masonry materials together.[30]

51.     CCAs' economic value is mainly based on their use to make concrete, the principal final product for construction work, and, to a lesser extent, CCA's uses in making cement and mortar.

52.     Concrete is essentially composed of a binder (cement), dry aggregates (gravel or sand), and water. Kinds of concrete include mass concrete, structural concrete, architectural concrete, lightweight (cellular) concrete, reinforced concrete (added metal structures for resistance in tunnels, bridges, buildings, etc.), prestressed concrete, and polished concrete. Concrete's advantages for construction include ready accessibility of ingredients, adaptation to different structural purposes, malleability in its initial liquid state, durability, resistance to compression, bending, cutting and traction, and relatively low maintenance.[31]

---

Patrick McCombe, *Behind the Scenes at a Concrete Batch Plant,* Find Home Homebuilding (April/May 2023).

[30] David Beaulieu, *The Differences Between Cement, Concrete, and Mortar*, the spruce (Aug. 24, 2022), https://www.thespruce.com/difference-between-cement-concrete-and-mortar-2130884 (accessed December 4, 2023).

[31] *Concrete*, ferrovial, https://www.ferrovial.com/en/resources/concrete/ (accessed December 2, 2023). Architectural concrete is concrete "designed and cast to be aesthetically pleasing in addition to being structurally sound." Matt Terranova, *What is Architectural Concrete?* RHA, https://www.reghoughassociates.com/post/architectural-concrete (accessed December 4, 2023).

1.    **Cement and Concrete's Roles in Modern Construction.**

53.    The United States produces approximately ten billion tons of concrete annually.[32]

54.    Concrete's uses include building facades, bridges, tunnels, dams and other infrastructure, and interior design (e.g., flooring). It is also used for such landscaping features as driveways, walls, walkways, and other landscaping features.[33]

55.    Concrete has advantages for use in various infrastructure projects. Concrete roads and highways are durable enough to withstand consistent traffic of loaded vehicles. It is commonly used for the upper portions (superstructures) of bridges, including decks, curbs, sidewalks, and side traffic barrier walls. Concrete is also used to build dams, one of the most demanding construction applications.[34]

56.    Concrete is also recyclable. Approximately 140 million tons of concrete are recycled annually in the United States. When concrete is demolished, the aggregates are collected and crushed for reuse. If the concrete contains steel rebars, magnets and other sorting devices are later used to collect the metal.

2.    **Mixing Compounds to Make Concrete**

57.    Suppliers and contractors produce concrete at a plant or at a job site, depending on the particular project. Concrete can be manufactured off-site and then transported to the construction site (pre-cast concrete), poured directly into formwork at the project site (cast-in-place), or sprayed on to a surface at the project site (sprayed concrete). Equipment can vary from

---

[32] *Concrete Production and Applications*, Reliance Foundry, https://www.reliance-foundry.com/blog/concrete-production (accessed December 2, 2023).

[33] Connor Fielding, *Architectural Concrete: A Full Guide*, ZP Architects Engineers (Aug 25, 2023), https://www.zparcheng.com/blog/architectural-concrete (accessed December 3, 2023).

[34] Concrete Production and Applications, *supra*.

hand tools used for do-it-yourself projects to large industrial machinery. The process must thoroughly mix the ingredients, and mold and shape the resulting soft concrete within the specific time constraints posed by the project [35]

58.    Generally, making concrete involves selecting and planning the chemical ingredients, preparing the ingredients (including cement, aggregate, and water), mixing the ingredients, adding water to the dry ingredients (hydration), setting up the framework and reinforcement for the concrete, placing or pouring the concrete, curing the concrete, and maintaining the concrete after it has been installed.

59.    The following flow chart illustrates the process of making concrete.



### 3.    Selecting Materials and Planning the Chemical Mixture.

60.    Specifications for the mixtures to become concrete are generally planned before the ingredients are combined to make the product.[36] Concrete components react differently together

---

[35] Fielding, *Architectural Concrete, supra*; Concrete Production and Applications, *supra*.

[36] Andrew Logan, *Explained:  Cement vs. Concrete—Their Differences, and Opportunities for Sustainability*, MIT News (April 3, 2020), https://news.mit.edu/2020/explained-cement-vs-

depending on the proportions of the various ingredients. The type and proportions of cement, aggregates, water, and any admixtures, affect the resulting concrete's strength, durability, permeability, and its "resistance to environmental factors."[37] A poor mix design can risk such problems as efflorescence (white chalky deposits), spalling (cracking and delamination), and shrinkage cracks, which may increase eventual maintenance costs.[38]

61.    The best ratio for mixing concrete ingredients varies depending on the project. The amount of water in the mix can substantially affect the resulting product. For example, insufficient water can leave the cement's chemical hardening incomplete, making the mix quite difficult to manipulate. However, if too much water is added, the water can replace the aggregate, leading to a weak concentrate.[39]

62.    Such planning often includes admixtures and other CCAs.[40] Admixtures and surface treatments can enhance the concrete's properties. For examples, a water-reducing admixture should increase the concrete's strength and reduce its permeability, and an air entraining admixture should improve its freeze-thaw durability.[41] In hot weather, a water reducing admixture increases the time between mixing and hardening of the concrete.[42]

---

concrete-understanding-differences-and-sustainability-opportunities-0403 (accessed December 2, 2023)

[37] Fielding, *supra*.

[38] *How Is Concrete Made?* MT Copeland (Feb. 4, 2022), https://mtcopeland.com/blog/how-is-concrete-made/ (accessed December 2, 2023); Fielding, supra.

[39] *Id*.

[40] *See* McCombe, *supra*.

[41] Fielding, *supra*.

[42] Bob Reed, *How to Make Concrete*, Loughborough University (2017), https://wedc-knowledge.lboro.ac.uk/resources/booklets/G032-How-to-make-concrete-online.pdf (accessed December 2, 2023).

### 4.    Preparing Cement and Other Ingredients.

63.    After the concrete ingredients and their correct proportions have been determined, the ingredients must be manufactured and brought together.

64.    A fundamental concrete ingredient is cement, which is often 7 to 15 percent of the mix. Cement is manufactured by combining calcium, silicon, aluminum, iron and other ingredients. Manufacturers commonly use limestone, shells, a chalk or marl combination, shale, clay, blast furnace slag, silaca sand, and iron ore. Portland cement is most commonly manufactured through a dry method with limestone, clay, and other materials. The main raw materials are first quarried in rock form, and then crushed in multiple crushing steps. The crushed rock is combined with such other ingredients as iron ore or fly ash, and fed into a kiln, which heats the ingredients to very high temperatures in a tall cylindrical kiln lined with special firebrick. The heating drives certain elements out as gases, leaving marble-sized grey balls called "clinker." The plant cools clinker from its red-hot state and grinds it with gypsum and limestone to a fine powder, which may be as fine as 150 million grains per pound. This finely ground cement is shipped to ready-mix concrete companies to use in various construction projects.[43] The following flowchart shows a simplified dry manufacturing process for cement.[44]

---

[43] *See generally*, Logan, *supra*; McCombe, *supra* (mix percentage).

[44] Some United States kilns instead use a wet manufacturing process instead of the above dry method. The wet process involves grinding the raw materials with water before feeding them to the kiln. *How Cement is Made, supra.*

**Making Cement – Precursor for Concrete**



65.     A second set of concrete ingredients are the aggregates, which can run 60 – 75 percent of the concrete mix. Aggregates typically include both fine sand and coarser rock and provide much of concrete's durability.[45]

66.     A third main concrete ingredient is water, which may be 14 to 21 percent of the mix. Sources say water that is potable (drinkable) generally suffices for making concrete.[46] One source recommends municipal water for concrete in residential construction.[47] Other discussions focus more on the ratio of the water to the other ingredients than on the water's characteristics.[48]

67.     Admixtures, or CCAs, are another important ingredient determining the concrete's properties, as further discussed below. Admixtures may be added to make the concrete stronger by

---

[45] *How is Concrete Made, supra*; McCombe, *supra*.

[46] *E.g., Can You Use Any Source of Water as Mixing Water*, American Concrete Institute, https://www.concrete.org/tools/frequentlyaskedquestions.aspx?faqid=703 (accessed December 4, 2023); McCombe, *supra*.

[47] McCombe, *supra*.

[48] *E.g., How to Make Concrete, supra*.

lowering the water to cement ratio, making the concrete easier to work with, or slowing or accelerating the concrete's setting time.[49]

### 5.    Reinforcing Steel and Setting Forms for Concrete

68.    Concrete has good strength for compression and abrasion forces but has low tensile strength (strength when stretched or pulled) and low ductility (ability to stretch). Reinforcing concrete by embedding steel in the concrete takes advantage of steel's ability to withstand shearing and bending forces to strengthen concrete building parts, such as slabs, walls, beams, and columns. Reinforced concrete's invention in the 1800s revolutionized the construction industry by substantially improving concrete's strength.[50]

69.    A frequent reinforcement method is adding reinforcing bars (rebars) to concrete structures. This method also encourages the concrete's expansion and contraction to deal with heat and cold. Other metal additions include rods, wires, cables, or mesh.

70.    However, adding steel to the concrete adds a potential for the steel's corrosion, which can eventually reduce the structure's load bearing capacity. Owners, designers, and contractors may therefore consider adjusting the concrete mix, which may include CCAs or admixtures, after analyzing the steel's qualities to minimize the potential corrosion.[51]

71.    Concrete needs to flow well to build walls or footings with rebar to get the concrete mix into the forms and form properly around the rebar, which can weaken the concrete structure.

---

[49] *How is Concrete Made, supra.*

[50] Field, *supra*; *Reinforced Concrete:  Types, Characteristics & Advantages*, Tim Global Engineering (Jan. 6, 2021), https://www.timglobaleng.com/blog/reinforced-concrete-types-characteristics-advantages/ (accessed December 4, 2023).

[51] Fielding, *supra.*

Concrete with a high water-to-cement ratio can be difficult to work with in such a setting, taking longer to set for finishing, and may weaken the concrete.[52]

72.    In addition to reinforcement, the parties may need to prepare forms for shaping the concrete when it is poured. When the water is first added, the concrete is in a somewhat liquid state and will not keep to a specific shape. Accordingly, a form or framework should be prepared for the concrete to be poured in to while it is in its liquid state. This may involve wooden forms or timber walls.

### 6.    Mixing and Hydration in Making Concrete.

73.    After the forms and reinforcements are ready, the ingredients (including any admixtures) may be mixed. When cement is combined with water, it becomes a cement paste, and begins the hydration process. If sand is added to the paste, it becomes mortar. If instead aggregates (stones up to an inch in diameter) are added, the cement paste becomes concrete.[53]

74.    Hydration, a chemical reaction that occurs when water and cement mix, is the process that gives the concrete its strength. Mixing and hydration initially change the dry ingredients into a more fluid compound that can be poured and then cured and hardened. During hydration, the clinker in the cement dissolves into the calcium and recombines with water and silica to form calcium silica hydrates (CSH), forming tight chemical bonds that strengthen the material as it cures.[54]

75.    While the concrete is freshly mixed and soft, it can be poured around rebar or other reinforcements, and into the frames to shape the concrete. Pouring must be accomplished while

---

[52] McCombe, *supra*.

[53] Logan, *supra*.

[54] *Id.*

the concrete is still soft, since hardening makes it more difficult to form and place. This window of time before concrete hardens depends on the temperature and other factors, but concrete often sets within an hour in hot climates to five to six hours in colder climates. The hydration process releases small amounts of heat. The heat is generally not a problem, but too much heat can remove the water, preventing full hardening or causing cracking.[55] A contractor may need multiple deliveries of liquid concrete mix in order to time the placement of a larger quantity of concrete.[56]

76.    Curing refers to the chemical hardening of the concrete. Once the top level of the concrete has hardened, the contractor encourages curing so the concrete continues to harden and gain strength. The concrete must be kept moist and hydrated for this process to continue. The process and its methods may vary depending on the type of concrete and the weather of its location. Curing methods include covering the concrete with moistened fabric or wet sand and spraying the concrete with a curing compound spray.[57] One source suggests shuttering the concrete for a week to continue this process.[58]

B.    **Contractors Use Substantial Amounts of Various Kinds of CCA to Improve Concrete and Mortar.**

*1.    CCAs Comprise a Substantial Market in the Construction Sector.*

61.    CCAs for binding compounds are specialized chemicals or material added to mixes like cement or concrete to enhance the binding compounds' properties and performance. Such additives can improve the workability, durability, and strength of concrete or other binding

---

[55] Bob Reed, *How to Make Concrete*, Loughborough University (2017), https://wedc-knowledge.lboro.ac.uk/resources/booklets/G032-How-to-make-concrete-online.pdf (accessed December 2, 2023).

[56] *See* McCombe, *supra*.

[57] *Id.*; *How Concrete Is Made, supra*.

[58] Reed, *supra*.

compounds. There are various additives, for example, for concrete, such as water-reducing, air-entraining, retarding, accelerating, and plasticizers, each with a distinct purpose.[59]

62.    Purchasers of CCAs operate in the construction and industrial sectors and include producers of ready-mixed concrete, shotcrete[60], and pre-cast concrete[61]. Purchasers of CCAs typically purchase the majority of their CCAs from a single supplier.[62]

63.    In general, Defendants sell CCAs directly to suppliers of ready-mix concrete and masonry, as well as through distributors.

77.    Most CCAs are sold in ready-to-use liquid form and can be added to the cement, concrete, or mortar either at the plant where it is produced (e.g., ready-made concrete mix) or at the jobsite where it is to be used.[63]

78.    The U.S. market for concrete admixtures was valued at US$ 3.1 billion for 2022 and will reach an estimated US$ 4.7 billion by 2032.[64] Increased construction based on population growth and infrastructure development is predicted to encourage this market's growth. Each of several sub-segments based on different types of additives was estimated to earn revenue exceeding US$ 200 million for 2022, as shown in the following table.[65]

---

[59] Anjumnisha Sayyad & Eswara Prasad, U.S. Admixtures for Concrete Market:  Opportunity Analysis and Industry Forecast, 2023 – 2032, at 20 (Nov. 2023) (hereinafter "Sayyad & Prasad").

[60] Shotcrete (or gunite) is a type of ready-mixed concrete that, instead of being poured and spread, is fed through a hose and applied using a high-pressure sprayer. It is typically used for concrete walls, such as in tunnels.

[61] Sika USA, A Complete Range of Concrete Admixtures, https://usa.sika.com/en/construction/concrete/concreteadmixtures.html.

[62] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 49 (Sept. 23, 2022).

[63] Sika, Corporate Governance (2022), https://www.sika.com/dam/dms/corporate/media/glo-ar-2022corporategovernance.pdf.

[64] *Id.* at 30.

[65] *Id.* at 34 & 81-82.

| SEGMENT | SUB-SEGMENT | REVENUE 2022 ($Million) | FORECAST-2032 ($Million) | CAGR (2023-2032) |
|---|---|---|---|---|
| By Type | Concrete Water Reducers | 923.4 | 1,403.2 | 4.4% |
| | Concrete Expanding Agent | 252.6 | 360.7 | 3.6% |
| | Concrete Accelerator | 347.9 | 572.0 | 5.2% |
| | Air Entrainers | 293.5 | 468.2 | 4.8% |
| | Corrosion Inhibiting | 231.4 | 339.5 | 3.8% |
| | Retarding | 369.7 | 578.1 | 4.6% |
| | Others | 676.1 | 993.5 | 4.2% |
| By Application | Commercial Concrete | 977.5 | 1,522.07 | 4.6% |
| | Pre-cast Concrete Units | 2,117.1 | 3,193.1 | 4.3% |

*Source: Primary Research, Government Publications, Company Releases, and AMR Analysis*

79.    Such bonding additives (CCAs) are used to improve concrete's strength, durability, workability, and other properties. They can extend concrete's setting time, which allows better concrete placement, especially for larger projects. Other CCAs can increase the concrete's early strength development or improve its quality and finishing.

80.    As noted in the above table, concrete CCAs include additives for both conventional commercial concrete projects and for pre-cast concrete. CCAs can enhance pre-cast concrete's performance and durability and extend its setting time. Pre-cast concrete provides cost-effective construction solutions for many projects. Such units can be produced with recycled materials and can be reused or recycled at the end of their lifecycle. The report valued the market for admixtures for pre-cast concrete at US\$ 2,117.2 million for 2022.[66]

81.    Due to their essential nature, the vast majority of projects using concrete, cement, and/or mortar also use CCAs.

---

[66] *Id.* at 84-86.

## 2.    CCAs and Their Functions

82.    As noted above, CCAs include (a) concrete admixtures, (b) cement additives, and (c) admixtures for mortar. The CMA has described the uses for each as follows:

> Chemical admixtures for cement are added to cement in order to reduce the amount of energy required to grind the cement (ie grinding aids) as well as to improve the performance of the cement (ie performance enhancers or quality improvers);
>
> Chemical admixtures for concrete are added to improve the properties of concrete or wet mortar, including super-plasticizers, plasticizers, air entrainers, retarders and accelerators; and
>
> Other chemical admixtures include admixtures for dry mortar and certain admixtures for wet mortar that are not also used for concrete, for example as they increase the adhesion properties of mortar but do not reduce the amount of water required.[67]

83.    Manufacturers of CCAs use the same equipment and chemicals to produce these CCAs, so they can quickly and cost-effectively shift production from one category of CCA to another.[68] On the other hand, purchasers of CCAs do not view these products as interchangeable, nor do purchasers view them as being substitutes for CCAs.

84.    CCAs are generally classified according to function. The main functions include reducing water, accelerating setting, air entraining, retarding setting, and plasticizing.[69]

### a.    Water Reducers

85.    Concrete water reducers or water reducing admixtures are added to concrete mixtures in order to reduce the water content needed while still maintaining the concrete's desired properties and to improve the concrete's workability. They lower the ratio of water to cement in

---

[67] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, FN 57 (Sept. 23, 2022)
[68] *Id.*
[69] *Chemical Admixtures,* PCA, https://www.cement.org/cement-concrete/concrete-materials/chemical-admixtures (accessed December 4, 2023)

the ingredient mix, increasing the concrete's strength and decreasing its permeability. This change improves the concrete's ability to flow into the right place, decrease cracking, and make it easier to properly finish the product. They also accelerate the curing process, allowing workers to remove the forms surrounding the concrete and complete the project more promptly.[70] Water reducers also reduce water consumption, contributing to a project's sustainability. Water reducers generated US$ 923.4 million in 2022.[71] Consistent with those substantial sales, one source estimated that 70 to 80 percent of concrete mixes contain some form of water reducer.[72]

86.    Water reducers are divided into three general types. They are conventional, mid-range, and high-range admixtures. Conventional water reducers are commonly used for everyday concrete projects such as sidewalks, driveways, footers, and basement walls. They reduce the water requirement by five percent or more. High-range water reducers are also called superplasticizers, discussed next.[73]

### b.    Superplasticizers

87.    Superplasticizers are also known as plasticizers or high-range water reducers (HRWR). They are often made of calcium, ammonium lignosulphates, and sodium. They can reduce the water content by 12 to 30 percent and can be added to concrete with a low-to-normal "slump" and water-cement ratio to make high-slump flowing concrete.[74] "Slump" refers to how liquid the concrete is before it sets, and is measured by how much a sample of freshly mixed

---

[70] *Id.* at 57-58.

[71] *Id.* at 59.

[72] Susan M. Brimo-Cox, *The Magic of Water Reducers in Concrete*, Concrete Décor (Jan. 2005), https://www.concretedecor.net/departments/concrete-placing/the-magic-of-water-reducers/ (accessed December 5, 2023).

[73] *Id.*

[74] PCA, *supra*.

concrete settle when removed from a conical test container. Therefore, concrete with a plasticizer has more slump and works better for "trench-filled-foundations requiring high flowability."[75]

### c.    Expanding Agents

88.    Users add expanding agents or shrinkage compensating admixtures (such as calcium sulfoaluminate or calcium oxide) to concrete mixes to induce controlled expansion. These agents react with water to increase the volume of concrete, adjusting for shrinkage issues and reducing the risk of the concrete cracking. The expansion enhances durability and minimizes cracking in bridge decks, other pavement, and other larger structures. Expanding agents also protect the concrete from temperature variations and internal stresses. By reducing the cement content in the concrete mixture, they decrease a project's carbon emissions.[76] U.S. sales revenue for concrete expanding agents ran US$ 252.6 million in 2022.[77]

### d.    Concrete Accelerators

89.    Concrete accelerator speeds concrete's setting and curing. Its various chemicals commonly include calcium chloride. It helps concrete more rapidly attain its required strength and durability and is useful for cold weather curing. Such applications as road repairs, precast concrete manufacturing, and high-strength applications demand a shorter construction timeline encouraging this product's use. Its uses include infrastructure repairs and construction. This product's 2022 U.S. sales ran US$ 347.9 million.[78]

---

[75] *What is Meant by 'Concrete Slump' & Why Does It Matter?* Total Concrete Limited, https://www.totalconcrete.co.uk/news/what-is-concrete-slump-and-why-does-it-matter/ (accessed December 4, 2023); McCombe, *supra*.

[76] *Id.* at 60.

[77] *Id.* at 62.

[78] *Id.* at 63-65.

### e.    Air Entrainers

90.    Air entrainers add bubbles to the concrete mix, typically 0.2 to 0.6 mm in diameter, which improve the concrete's durability and workability. By accommodating the expansion of water as it freezes, they reduce the risk of freeze-thaw damage, "preventing internal pressure build-up and cracking." They also increase resistance to scaling and chemical attack, make handling easier, and contribute to concrete's longevity in harsh environments. They can reduce the amount of cement in concrete mixtures, reducing the project's carbon footprint. Uses include bridges, pavement, and buildings. Air entrainer 2022 U.S. revenue was US$293.5 million.[79]

### f.    Corrosion Inhibitors

91.    Somewhat more specialized products, corrosion inhibiting admixtures mitigate the effects of corrosion on reinforcing steel or metals embedded in the concrete by creating a protective layer on the metal surface, reducing penetration of moisture, oxygen, and aggressive chemicals, and preventing rust. Such compounds "are commonly used in reinforced concrete structures, such as bridges, parking garages, and marine environments, where steel reinforcement is susceptible to corrosion." They may reduce repair and maintenance costs and enhance structural durability. U.S. corrosion inhibitor sales in 2022 ran US$ 231.4 million.[80]

### g.    Retarding Admixtures

92.    Users add retarding admixtures to concrete to delay its setting time, which extends its workability. Such compounds as ligosulfanates or gluconates interact with the cement particles to slow the hydration process. This addition improves handling, placement, and finishing of concrete, especially in hot weather, in larger projects requiring timing concrete placement with

---

[79] *Id.* at 66-68.

[80] *Id.* at 69 & 71; PCA, *supra* (noting defensive strategy for such structures as marine facilities, highway bridges, and parking garages that "will be exposed to high concentrations of chloride").

other complex tasks, or when longer transportation is required. These admixtures are also useful for precast concrete and ready-mix concrete. Revenue from these admixtures in the U.S. ran US$ 369.7 million in 2022.[81]

### h.    Pozzolans

93.    Some sources consider Pozzolan as another type of admixture. Pozzolans, added to a concrete mix, convert Calcium-Hydroxide (CH) into Calcium-Silicate-Hydrate (CSH). Calcium Hydroxide, a byproduct of the hydration process, can make concrete more porous, allowing water and harmful chemicals to enter the concrete. On the other hand, Calcium-Silicate-Hydrate is the main binder in concrete. By reducing the Calcium-Hydroxide and increasing the Calcium-Silicate-Hydrate, adding Pozzolan is said to increase concrete's long-term compressive strength.[82]

94.    The following table shows several CCAs, and lists materials used in their admixtures, the effect the CCA attempts to cause, and the effect the CCA may have on the final product's color.[83]

---

[81] Sayyad & Prasad, *supra*.

[82] *What is Pozzolan?* CRMinerals, https://www.crminerals.com/pozzolans.php (accessed December 5, 2023).

[83] Chris Sullivan, *Admixtures by Classification*, ConcreteNetwork.com, https://www.concretenetwork.com/photo-gallery/site_26/chris-sullivan_14351/ (accessed December 4, 2023).

Chris Sullivan

## Admixtures by Classification

| Type of Admixture | Material | Desired Effect | Effect on Color |
|---|---|---|---|
| Air Entraining (ASTM C260) | Salts of wood resins<br>Some synthetic detergents<br>Salts of sulfonated lignin<br>Salts of petroleum acids<br>Salts of proteinacious material<br>Fatty and resinous acids and their salts<br>Alkydbenzene sulfonates | Improved durability | Normally makes color lighter |
| Plasticizer (ASTM C494, Type A) | Lignosulfonates<br>Hydroxylated carboxylic acids<br>(also tend to retard set, so accelerator is added) | Reduce water required for given consistency | Initially darker; reduced color effect in later stages |
| Accelerator (ASTM C494, Type C) | Calcium Chloride (ASTM D98)<br>Triethanolamine | Accelerate setting & early strength development | Darker color |
| Pozzolan (ASTM C618) | Natural Pozzolans (Class N)<br>Fly Ash (Class F and G)<br>Other materials (Class S) | Reduce costs; improved workability and plasticity. | Typically lightens but may darken due to plasticizing effect; inherent color affects final color also. |
| Water Repellant | Stearate of calcium, aluminum, ammonium, or butyl<br>Petroleum greases or oils<br>Soluble chlorides | Decrease permeability | Possibly darkens color |

3. **Cement Additives**

95.    Cement additives are a type of construction chemical "added to cement for the optimization of the cement properties and the cement grinding process."[84] Admixtures can come in liquid or powder form.[85] Properties enhanced by cement additives include the time required for the cement to set, how easy the cement is to shape and work with, and whether it will dry without

---

[84] *Cement Additives*, SIKA, https://www.sika.com/en/construction/cement/additives.html#:~:text=Cement%20additives%20are%20materials%20added,strength%20enhancers%20and%20performance%20enhancers (last visited Oct. 25, 2023).

[85] *Sika Concrete Handbook* 14, SIKA (2020), https://www.sika.com/dam/dms/corporate/t/glo-sika-concrete-handbook.pdf.

cracking or shrinking.[86] Cement additives can be classified as either a grinding aid, strength enhancer, or performance enhancer.[87] Grinding aids are added in the cement mill to "increase the productivity, save electrical energy and/or to increase the fineness and improve defined cement properties."[88] Strength enhancers "increase the mechanical strength of cement" and often rely on chemical activation.[89] Performance enhancers can improve the quality of cement by either accelerating the setting time, improving the flowability, and accelerating better late strength enhancement.[90]

### 4.    *Mortar Admixtures*

96.    Mortar admixtures are added to mortar to increase its waterproofing, water-repelling, efflorescence (crystalline deposits of salt) control, air entrainment, or accelerating or retarding capabilities. .[91]

### C.    Global Antitrust Investigations into Defendants' Anticompetitive Conduct

64.    On October 17, 2023, the European Commission stated it carried out unannounced antitrust inspections at the premises of companies in the construction chemicals sector in "several

---

[86] *GCP Function Additives*, GCP, https://gcpat.com/en/products/gcp-functional-additives (last visited Oct. 25, 2023).

[87] *Cement Additives*, SIKA, https://www.sika.com/en/construction/cement/additives.html#:~:text=Cement%20additives%20are%20materials%20added,strength%20enhancers%20and%20performance%20enhancers (last visited Oct. 25, 2023).

[88] *Id.*

[89] *Id.*

[90] *Fosroc Grinding Aids and Performance Enhancers*, FOSROC, https://www.fosroc.com/assets/productDocuments/NEW-CEMAX-BROCHURE.pdf (last visited Oct. 25, 2023).

[91] Gopal Mishra, *Mortar Admixtures- Types, Uses, and Benefits in Masonry Construction*, THE CONSTRUCTOR, https://theconstructor.org/building/mortar-admixtures-types-uses-benefits-masonry-construction/30880/ (last visited Oct. 25, 2023).

Member States." The Commission expressed concerns about violations of EU prohibitions on cartels and restrictive business practices under Article 101 of the Treaty on the Functioning of the European Union.  The official statement described the subject of the investigation:

> The construction chemicals concerned by the inspection are chemical additives for cement and chemical admixtures for concrete and mortar. These are ingredients that are added to cement, concrete and mortar to modify and improve their properties and provide them with specific qualities. The Commission officials were accompanied by their counterparts from the relevant national competition authorities of the Member States where the inspections were carried out. Today's inspections were conducted in coordination with the UK Competition and Markets Authority and the Turkish Competition Authority. The Commission has also been in contact with the United States Department of Justice, Antitrust Division.[92]

65.    The United Kingdom's Competition and Markets Authority (CMA) also issued a statement that day that it was investigating anti-competitive conduct in relation to the supply of chemical admixtures and additives for use in concrete, cement, mortars, and related construction products. The CMA's statement said:

> The CMA has launched an investigation into suspected anti-competitive conduct in relation to the supply of chemicals for use in the construction industry.
>
> The Competition and Markets Authority (CMA) has reason to suspect anti-competitive behavior has taken place involving a number of suppliers of these chemicals and some industry bodies. This conduct relates to the supply of chemical admixtures and additives which are an essential input for products like concrete, mortars and cement used in the construction industry.
>
> The CMA is working closely with the European Commission, which has also launched an investigation into suspected anticompetitive conduct in the sector today. The CMA is also in contact with other

---

[92] *Construction Chemical Companies Raided Over Cartel Suspicions, EU Commission Says*, mlex (Oct. 17, 2023) (Official Statement).

authorities, including the United States Department of Justice, Antitrust Division.[93]

66.    The CMA's footnote stated it would normally publish names of the targets of its investigation, as soon as possible, except where a disclosure could prejudice an investigation of CMA or CMA partner. "In this case," the CMA stated, it would not release those targets' identities at that point.

67.    An article analyzing the dawn raids that day noted the sector's recent consolidation. It particularly pointed out the approval of Sika's € 5.2 billion takeover of MBCC earlier in 2023, and Saint-Gobain's acquisition of GCP Applied Technologies.[94]

68.    An update on the investigations the day after the dawn raids revealed that Cinven disclosed its Master Builders Solutions' cooperation with the investigation. Cinven stated, "Master Builders Solutions confirms investigations are underway by the European Commission as part of its broader investigation of the construction industry." Master Builders had been spun off from MBCC to Cinven in 2023 to address competition law concerns about Sika's acquisition of MBCC.[95]

69.    Sika issued a statement acknowledging the investigations on October 17th, the day of the dawn raids. Sika stated,

> Today, various competition authorities launched an investigation into suspected antitrust irregularities in the area of additives for

---

[93] Competition and Markets Authority, *CMA Launches Investigation Into the Supply of Chemicals for Use in Construction Industry*, Gov.UK (Oct. 17, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-the-supply-of-chemicals-for-use-in-construction-industry (accessed December 6, 2023); *Construction Sector Chemical Suppliers Under Investigation by UK CMA,* mlex (Oct. 17, 2023)

[94] Les Crofts and Nicholas Hirst, *Construction Chemicals Sector Draws EU, UK Antitrust Raids*, mlex (Oct. 17, 2023) (noting it is "not uncommon for consolidation to lead to antitrust scrutiny").

[95] Nicholas Hirst and Lewis Crofts, *Saint-Gobain, Sika, MBS Are Cooperating With Antitrust Probes Into Construction Chemicals (Update)* mlex (Updated Oct. 18, 2023).

concrete and cement. The investigation concerns several industry representatives. Sika confirms that the European and British competition authorities visited some premises as part of this investigation. Compliance with competition rules in all business areas is crucial for Sika. The fair operation of markets is fundamental to Sika and we support this investigation with all our efforts and cooperate fully with the authorities.[96]

70.     Another article reported that Sika admitted that authorities from the three involved state bodies "had visited some of its premises, and that contact with U.S. antitrust authorities has been established."[97] Saint-Gobain similarly acknowledged its involvement in the investigation on the day of the dawn raids.  In pertinent part, Saint-Gobain stated,

Competition law investigations have been announced in relation to the supply of chemical additives for cement and chemical admixtures for concrete and mortar in the European Union, the United Kingdom and Turkey. The Group is aware of and cooperating with these investigations.

Saint-Gobain recently reinforced its presence in this sector through acquisitions.

Saint-Gobain can confirm that inspections have taken place at its Construction Chemicals business site in Turkey.[98]

71.     Three days later, on October 20, 2023, the Turkish Competition Authority issued a statement that, working with EU and UK regulators, it had raided 14 companies and two associations on suspicions of improperly sharing pricing strategies and competitively sensitive information, and suspicions of collusive bidding.  The Authority stated,

---

[96] *Sika Confirms Involvement in EU, UK Antitrust Raids* mlex (Oct. 17, 2023).

[97] Tom Brown, *EU, UK, Turkey Authorities Launch Construction Chems Antitrust Investigation*, ICIS (Oct. 18, 2023), https://www.icis.com/explore/resources/news/2023/10/18/10935016/eu-uk-turkey-authorities-launch-construction-chems-%20antitrust-investigation/ (accessed December 7, 2023).

[98] *Saint-Gobain Confirms Raids in Turkey in Antitrust Probes into Construction Chemicals*, mlex (Oct. 18, 2023).

This preliminary inquiry is aimed at determining whether Article 4 of the Act No. 4054 on the Protection of Competition has been violated in the construction chemicals (and especially chemical mixtures) markets through concluding agreements on pricing strategies, exchanging competitively sensitive information and collusive bidding.

To that end, on-site inspections were conducted at the premises of 14 undertakings and 2 associations of undertakings operating in the field of construction chemicals between October 17-19.

Construction chemicals primarily consist of chemical additives and mixtures. These additives and mixtures are added to certain construction products as cement, concrete and grout to change and improve the characteristics of these products. Thus, additives and mixtures in the construction chemicals category are used as an important input in the cement and read-mix concrete sectors which determine their characteristics and quality.[99]

72.     The Turkish Authority's statement added that the agency prepared for the investigation along with the European Commission Directorate General for Competition.  It added the on-site inspections were "conducted simultaneously and in coordination with the European Commission and the UK Competition and Markets Authority."[100]

73.     On November 6, 2023, three weeks after the raids, the UK's Competition Appeals Tribunal (CAT) issued a judgment concerning an application for warrants. The judgment indicated that on October 17, 2023 (the day of the dawn raids), the tribunal issued a judgment regarding four search warrants. The tribunal approved three of the four search warrants. The deemed date of the *ex parte* order was October 17, 2023, at 7:30 a.m. On October 27, 2023, the CMA had applied to the CAT for an order keeping the October 17th judgment closed (secret). The CMA had asserted "reasonable grounds for suspecting that, if the documents the subject of the warrant were required

---

[99] *Construction-Chemical Cartel Probe in Turkey Sees 14 Companies, Two Associations Raided*, mlex (Oct. 20, 2023) (Official Statement).

[100] *Id.*

to be produced, they would be concealed, removed, tampered with or destroyed," the application must be made in secret. Based on the warrants having been executed, the November 6th judgment indicated the order approving the warrants should not remain closed.[101]

74.     When the Competition Appeals Tribunal's judgment was made public, it was redacted and did not reveal the substance of the investigation. However, the CMA confirmed on the same day as the judgment that it had executed surprise inspections of companies active in the "'supply of chemical admixtures and additives for use in concrete, cement, mortar and related construction products.'"[102]

75.     The CMA will usually seek a warrant to search premises if it suspects that the information relevant to the investigation might be interfered with or destroyed if only a written request for the information is issued. Therefore, as the CMA put it, "the CMA mostly uses this power to gather information from businesses or individuals suspected of participating in a cartel."[103]

76.     The inspections by the EC were not undertaken casually. Inspections are typically done by an order of the EC, and the EC must have "reasonable grounds for suspecting an infringe-ment of the competition rules;" "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary evidence to check the actual existence

---

[101] *Competition & Markets Auth. v. Another,* [2023] CAT 68 (Nov. 6, 2023) 1611/13/12/2023.

[102] Lewis Crofts, *Cartel Raids at Scottish Property Were Blocked by UK Court, Judgment Reveals*, mlex (Dec. 7, 2023); *see Competition & Markets Auth. v. Another,* [2023] CAT 62 (Oct. 12, 2023) 1611/13/12/2023

[103] *Guidance on the CMA's Investigation Procedures in Competition Act 1998 Cases: CMA8* § 6.30 CMA, Gov.UK (Jan. 31, 2022), https://www.gov.uk/government/publications/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases#entering-and-searching-premises-with-a-warrant (accessed December 6, 2023).

and scope of a given factual and legal situation concerning which it already possesses certain information."[104]

77.    The same is true for the TCA. Earlier this year, the Turkish Constitutional Court, the highest legal body for constitutional review in Turkey, held that the TCA may conduct a dawn raid after first obtaining a search warrant from a Turkish criminal court.[105]

### D.    Defendants Effectuated Their Conspiracy Through Their Shared CCA Trade Associations

78.    In announcing the coordinated dawn raids, the CMA stated that the anticompetitive conduct at issue included not only individual companies, but also "some industry bodies." This is hardly surprising, given that Defendants share membership in a multitude of CCA trade associations around the World. This gave Defendants ample opportunity to meet and conspire in furtherance of their agreement to fix prices for CCAs.

79.    Defendants Sika, Saint-Gobain Group, and Master Builders Group are members of the following shared trade associations: (a) the Belgian CCA trade association, FIPAH;[106] (b) the French CCA trade association, SYNAD;[107] (c) the Italian CCA trade association, ASSIAD;[108] (d) the Norwegian CCA trade association, NCCA;[109] (e) the Spanish CCA trade association, ANFAH;[110] (f) the Swedish CCA trade association, SACA; [111] (g) the Turkish CCA trade

---

[104] Case No. T-135/09, Nexans France SAS v. Comm'n, 2012 E.C.R. 43.
[105] Lexology, A New Era for the On-Site Inspections by the TCA (Aug. 23, 2023), https://www.lexology.com/library/detail.aspx?g=31016b1d-6615-4bb5-ad85-9a8fd9db3ecf.
[106] FIPAH, Members, https://www.fipah.be/fr/membres/
[107] Synad, https://www.synad.fr/synad-syndicat-des-fabricants-d-adjuvants-beton-colorants-fibres.
[108] ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.
[109] NCAA, Welcome, https://ncca.no/.
[110] ANFAH, Associate Members, https://anfah.org/anfah/miembros-de-anfah/.
[111] SACA, Member Companies, https://www.saca.se/medlemmar.html.

association, KUB;[112] and (h) the UK CCA trade association, CAA.[113]  Euclid is also a member of

KUB.[114] Each of these trade associations also belongs to an umbrella CCA trade association:

EFCA.

80.     **EFCA.** EFCA describes itself as "a partnership of 13 National Admixture

Associations, formed in 1984 in order to represent the interests of the industry."[115] EFCA's mem-

bership "provides in excess of 80% of admixture sales within Europe and represents all the major

admixture manufacturers."[116]

81.     The current EFCA Executive Board is made up of President Gianluca Bianchin,

Vice Presidents Thomas Hirschi and Osman Ilgen, Sustainability Committee Chair Nihal

Kinnersley, and Technical Committee Chair Francesco Surico.[117] Thomas Hirschi has worked at

Sika since July of 2001 and has served as "Target Market Manager Concrete Waterproofing" for

the company since January of 2017.[118] Osman Ilgen was Managing Director at Chryso from March

of 2015 through September of 2023 and has been a Vice President at Saint-Gobain Group since

January of 2023[119]. He also currently serves as President of KUB[120]. Nihal Kinnersley has worked

as a Product Stewardship Manager at GCP since March of 2016 and as a Product Stewardship

Director at Saint-Gobain Group since July of 2023.[121]

---

[112] KUB, About Us, https://kub.org.tr/hakkimizda/.

[113] Cement Admixtures Association, Members, https://www.admixtures.org.uk/members/.

[114] KUB, About Us, https://kub.org.tr/hakkimizda/.

[115] EFCA, About Us, https://www.efca.info/about-us/.

[116] *Id.*

[117] EFCA, Structure, https://www.efca.info/about-us/efca-structure/.

[118] Thomas Hirschi, LinkedIn Profile, https://www.linkedin.com/in/thomas-hirschi-01159b83/?originalSubdomain=ch

[119] Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr.

[120] *Id.*

[121] Nihal Kinnersley, LinkedIn Profile, https://www.linkedin.com/in/nihal-kinnersley-ba506b22/?originalSubdomain=uk.

82.    Other members of the ECFA Board include Kai Salo of Sika, Claude Le Fur, who worked at Sika until July of 2021, and Suat Seven of Master Builders Group.[122]

83.    Members of the EFCA Technical Committee include Ian Ellis, who worked at Master Builders Group until July of 2022, Marko Kaisanlahti of Master Builders Group, Franz Wombacher of Sika, Trond Solbo of Sika, Osman Tezel of Saint-Gobain Group, Jean-Philippe Bigas of Saint-Gobain Group, and Robert Hurkmans of Saint-Gobain Group.[123]

84.    Members of the EFCA Environmental Committee (which is also referred to as the Sustainability Committee) include Marko Kaisanlahti of Master Builders Group, Maxime Julliot

---

[122] EFCA, Committees, https://www.efca.info/efca-committees/; Kai Salo, LinkedIn Profile,https://www.linkedin.com/in/kai-salo-72384880/?originalSubdomain=fi; Claude Le Fur, LinkedIn Profile,https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr; Suat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.

[123] EFCA, Committees, https://www.efca.info/efca-committees/; Ian Ellis, LinkedIn Profile,https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk; Marko Kaisanlahti, LinkedIn Profile, https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Franz Wombacher, LinkedIn Profile, https://www.linkedin.com/in/franz-wombacher-9888b941/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Sika Norway, Technical Department/Environment/QEHS, https://nor.sika.com/no/teknisk-avdeling.html; Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippebigas- 658a07b5/?originalSubdomain=fr; CHRYSO, Saint-Gobain Weber Beamix Enlarges its Offering in the Netherlands with Weber Cemfloor Screed and Chryso Concrete Admixtures (June 9, 2023), https://www.chryso.com/news/saint-gobain-weberbeamix-enlarges-its-offering-in-the-netherlands-with-weber-cemfloor-screed-and-chryso-concrete-admixtures/. ,https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Franz Wombacher, LinkedIn Profile, https://www.linkedin.com/in/franz-wombacher-9888b941/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Sika Norway, Technical Department/Environment/QEHS,https://nor.sika.com/no/teknisk-avdeling.html; Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippebigas 658a07b5/?originalSubdomain=fr; CHRYSO, Saint-Gobain Weber Beamix Enlarges its Offering in the Netherlands withWeber Cemfloor Screed and Chryso Concrete Admixtures (June 9, 2023), https://www.chryso.com/news/saint-gobain-weberbeamix-enlarges-its-offering-in-the-netherlands-with-weber-cemfloor-screed-and-chryso-concrete-admixtures/.

of Master Builders Group, Mark Schneider, who worked for Sika until October of 2022, Bjorn

Stockmann of Sika, Anders Larsson of Sika, and Osman Tezel of Saint-Gobain Group.[124]

85.    **FIPAH.** FIPAH's website declares that it was founded "with the aim of promoting

the common interests of the 'Concrete and Mortar Admixtures Industry.'"

86.    **SYNAD**. One of SYNAD's stated goals is to "to establish a relationship between

all market players." SYNAD representatives currently serving on EFCA committees include

Claude Le Fur, Jean-Philippe Bigas, and Maxime Julliot.[125] Claude Le Fur worked at Sika from

2008 through July of 2021, and his last role was "Manager of Business Development for Europe

South and Middle East."[126] Jean-Philippe Bigas began working for Chryso in 2006, and has served

as its "Technical Director in charge of regulatory aspects and sustainable development" since June

of 2023.[127] Maxime Julliot works as a Market Manager at Master Builders Group.[128]

---

[124] EFCA, Committees, https://www.efca.info/efca-committees/; Marko Kaisanlahti, LinkedIn Profile,
https://www.linkedin.com/in/marko-kaisanlahti-28ab2b116/?originalSubdomain=fi; Mark Schneider, LinkedIn Profile,
https://www.linkedin.com/in/mark-schneider-157a57108/?originalSubdomain=ch; Osman Ilgen, LinkedIn Profile,
https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; Bjorn Stockmann, LinkedIn Profile,
https://www.linkedin.com/in/bj%C3%B8rn-stockmann-52346034/?originalSubdomain=no; Andres Larsson, LinkedIn Profile,
https://www.linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se; Master Builders Solutions, Meet Our Team,
https://masterfiber.master-builders-solutions.com/contact/contact.
[125] EFCA, Committees, https://www.efca.info/efca-committees/.
[126] Claude Le Fur, LinkedIn Profile, https://www.linkedin.com/in/claude-le-fur-a4735857/?originalSubdomain=fr.
[127] Jean Philippe Bigas, LinkedIn Profile, https://www.linkedin.com/in/jean-philippe-bigas658a07b5/?originalSubdomain=fr.
[128] Master Builders Solutions, Meet Our Team, https://masterfiber.master-builders-solutions.com/contact/contact.

87.    **ASSIAD**. Part of ASSIAD's mission is to "bring together the interested companies or groups thereof to discuss issues of common interest." The ASSIAD website lists 11 "Consiglio Generale" members, including Leonardo Messaggi of Sika (President), Mario Casali of GCP, Donato Luciano of Chryso, and Roberto Spaggiari of Master Builders Group.[129] On April 9, 2021, ASSIAD announced four new members of the ASSIAD Board, including Donato Luciano of Master Builders Group, Jean Mascaro of Chryso, and Leonardo Messaggi of Sika.[130]

88.    On July 21, 2023, ASSIAD announced that Leonardo Messaggi of Sika was elected President of ASSIAD for the period from 2023 to 2027.[131] Leonardo Messaggi has worked for Sika since 2016 and currently serves as "Target Market Manager for Concrete & Industrial Flooring."[132] In addition, Paolo Novello of Chryso serves as the Vice President of ASSIAD.[133]

---

[129] ASSIAD, The Structure, https://www.assiad.it/LAssociazione/La-struttura.

[130] Press Release, ASSIAD, Two New Additions to the General Council (Apr. 9, 2021), https://www.assiad.it/News/duenuovi-ingressi-nel-consiglio-generale.

[131] Press Release, ASSIAD, ASSIAD Announces the Election of the New President and Vice Presidents for the Four-Year period 2023-2027 (July 21, 2023), https://www.assiad.it/News/assiad-annuncia-lelezione-del-nuovo-presidente-e-deivicepresidenti-per-il-quadriennio-2023-2027.

[132] Leonardo Messaggi, LinkedIn Profile, https://www.linkedin.com/in/leonardo-messaggi-5b949670/?locale=en_US.

[133] ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad; Ingenio, Concrete and Construction Post-Covid: Companies are Ready to Adopt the "Circular Economy" (July 29, 2020), https://www.ingenio-web.it/articoli/calcestruzzo-e-edilizia-post-covid-le-imprese-sono-pronte-ad-adottare-la-circular-economy/; Arketipo, ICARE Cement Technology by Chryso (Aug. 28, 2020), https://www.arketipomagazine.it/tecnologia-per-il-cementoicare-by-chryso/; Paolo Novello, LinkedIn Profile, https://www.linkedin.com/in/paolo-novello-bab315b2/?originalSubdomain=it.

89.    On October 4, 2023, ASSIAD announced the creation of a new Technical Evolution Committee made up of 13 members, including Fabrizio Avallone and Cristiano Cereda of Sika, Mario Casali and Pietro Massinari of Chryso, and Ivana Torresan of Master Builders Group.[134]

90.    On October 5, 2023, Messaggi announced that the thirteen (13) members of the new Technical Evolution Committee would participate in roundtables at the first "General States of Concrete Technology" at SAIE Bari, an industry meeting, in October of 2023.[135] Sika, Chryso, GCP, and Master Builders Group were all scheduled to participate as "exhibitors" at this meeting.[136]

91.    **NCCA**. NCCA representatives currently serving on EFCA committees include Trond Solbo and Bjorn Stockmann, who both work for Sika.[137] As explained herein, these Sika employees met with executives from other Defendants in their roles as EFCA committee members.

92.    **ANFAH.** ANFAH members represent "around 90% of the admixtures used in Spain."[138]

---

[134] ASSIAD, The Scientific Steering Committee and Technical Evolution Committee of ASSIAD are Born (Oct. 4, 2023), https://www.assiad.it/News/nascono-il-comitato-di-indirizzo-scientifico-e-comitato-evoluzione-tecnica-di-assiad.

[135] Ingenio, ASSIAD Among the Protagonists at the General States on Concrete Technology at SAIE Bari 2023 (Oct. 5, 2023), https://www.ingenio-web.it/articoli/assiad-tra-i-protagonisti-agli-stati-generali-della-tecnologia-del-calcestruzzo-al-saiebari-2023/.

[136] *Id.*

[137] SAIE, Exhibitor Preview, https://eventi.senaf.it/previewespositori.php?CSRFName=CSRFGuard_330546167&CSRFToken=7908882XTY66GK7IT8RA8XB7KGFK67NWMU5BCCDDP5O0T8VC1XGIJSJ3T8EOOB7B&rag_soc=master+builders&rag_soc_inizia=&settore=&ide=1816&action=reimposta.

[138] EFCA, Spain – ANFAH, https://www.efca.info/efca-members/spain-anfah/.

93.    **SACA.** SACA representatives currently serving on EFCA committees include Anders Larsson, who works for Sika.[139] As explained herein, Anders Larsson met with executives from other Defendants in his role as an EFCA committee member.

94.    **KUB.** KUB boasts that it "dominates 80% of the Turkish market," which itself makes up 40% of the total concrete admixture market in Europe.[140] On March 13, 2020, KUB announced that Turgay Ozkun, a General Manager at Sika, had been elected as Chairman of the Board. At the same time, Osman Ilgen, a Vice President with Saint-Gobain Group, was elected as Vice President of the Board, and Suat Seven of Master Builders Group was also elected to the Board.[141] Osman Ilgen currently serves as both President of KUB and Vice President of EFCA.[142]

95.    **CAA.** Two Master Builders Group executives currently hold leadership positions in the CAA: Chris Fletcher, a Master Builders Group Managing Director, is Chairman of the CAA Council, which "[e]stablishes and implements policy, promotes admixture use, [and] manages [CAA's] committees, task groups, and finances," while Ian Ellis, formerly a Master Builders Group Technical Services Manager, is Chairman of the CAA Technical Committee, which "[s]upports work on UK and European Standards, Codes, and Certification [and] [p]romotes

---

[139] EFCA, Committees, https://www.efca.info/efca-committees; Anders Larsson, LinkedIn Profile, https://linkedin.com/in/anders-larsson-3278731b7/?originalSubdomain=se.
[140] KUB, About Us, https://kub.org.tr/hakkimizda/.
[141] EFCA, New KUB President, https://www.efca.info/2020/03/13/new-kub-president/; Stuat Seven, LinkedIn Profile, https://www.linkedin.com/in/suat-seven-b9a7403a/?originalSubdomain=tr.
[142] Osman Ilgen, LinkedIn Profile, https://www.linkedin.com/in/osmanilgen1972/?originalSubdomain=tr; EFCA, Structure,https://www.efca.info/about-us/efca-structure/.

improvements in technical information, quality control, and level of technical support provided by CAA members."[143] Ian Ellis is also a member of the EFCA Technical Committee.[144]

E.    **Defendants' CCA Prices Soared During the Class Period as Defendants Signaled Price Increases**

1.    *Defendants' CCA Prices Have Climbed During the Class Period, Including by Imposing Surcharges*

96.    Publicly available financial reports and statements suggest that Defendants have consistently raised their prices for CCAs, including through surcharges, during the Class Period.

97.    For example, during an earnings call in April of 2022, RPM VP, Controller, and CAO Michael Laroche pointed to Euclid Group's concrete admixtures as one of the company's "fastest-growing businesses" and cited "selling price increases" as a key growth factor.[145] One year later, in an earnings release published in April of 2023, RPM noted that "record" sales in its construction segment were "driven by price increases and strength in concrete admixtures."[146]

98.    An investor report published by Saint-Gobain Group in February of 2021 cited "[u]pward trends in sales prices" as a key driver of the company's sales growth in 2020. [147]The same report published one year later similarly noted an "acceleration in prices in all segments" in 2021.[148] The report emphasized that Saint-Gobain Group had exhibited "strong pricing power and

---

[143] Cement Admixtures Association, CAA Structure, https://www.admixtures.org.uk/about-us/caa-structure/; Chris Fletcher, LinkedIn Profile, https://www.linkedin.com/in/chris-fletcher-84685137/?originalSubdomain=uk; Ian Ellis, LinkedIn Profile, https://www.linkedin.com/in/ian-ellis-72a94115/?originalSubdomain=uk.
[144] EFCA, Committees, https://www.efca.info/efca-committees/.
[145] RPM, Q3 2022 Earnings Call Transcript (Apr. 6, 2022), https://www.rpminc.com/media/3483/rpm-usq_transcript_2022-04-06.pdf.
[146] RPM, RPM Reports Record Fiscal 2023 Third-Quarter Results (Apr. 6, 2023), https://www.rpminc.com/media/4672/q3-23-rpm-earnings-release-final.pdf.
[147] Saint-Gobain, FY 2020 Results and Outlook (Feb. 26, 2021), https://www.saint-gobain.com/sites/saintgobain.com/files/fy-2020-ang-a_0.pdf.
[148] Saint-Gobain, FY 2021 Results and Outlook (Feb. 25, 2022), https://www.saint-gobain.com/sites/saintgobain.com/files/media/document/FY2021_ENG.pdf.

decisive execution" in raising its prices by as much as 10% to match the industry trend.[149] A press release published by Saint-Gobain Group in October of 2021 included a chart showing an average price increase of 9.7% across all of its segments over the previous two years.[150] In the Americas, Saint-Gobain's prices increased by 18.6% from October of 2019 to October of 2021.[151]

99.     Defendants have also signaled CCA price increases publicly during the Class Period. Examples are set forth below.

100.    In February of 2019, Sika CEO Paul Schuler announced that Sika would raise its prices for the second time that year: "We are going to increase prices further. We have increased prices in January and we will do it again in March."[152]

101.    On November 13, 2020, Master Builders Group announced that it would raise its CCA prices up to 10%, effective immediately.[153]

102.    On July 20, 2021, Masters Builders Group announced that it would be increasing previously-imposed surcharges on its products, including on CCAs, from six percent (6%) to nine percent (9%).[154]

---

[149] *Id.*

[150] Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saintgobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[151] *Id.*

[152] Reuters, Sika Raises Prices to Counter Jump in Raw Material Costs (Feb. 22, 2019), https://www.reuters.com/article/sikaresults-materials/sika-raises-prices-to-counter-jump-in-raw-material-costs-idUSZ8N1UN01Y/.

[153] Sika, Master Builders Solutions to Increase Prices for Construction Chemicals (Nov. 13, 2020), https://mbcc.sika.com/envn/about-us/news/price-increase-announcement.

[154] Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (July 20,2021), https://www.negwer.com/Portals/0/Documents/Vendor%20News/2021%20Price%20Increases/2021_07_20_Master%20Builders%20Solutions%20Surcharge%20Letter_EN.pdf?ver=2021-07-21-080522-810.

103.    On November 29, 2021, GCP announced that it would raise its CCA prices up to10% for North American customers, effective in January of 2022.[155]

104.    On January 14, 2022, Master Builders Group announced that it would be increasing previously-imposed surcharges on its products, including on CCAs, to be as high as forty percent (40%).[156]

105.    Also in January of 2022, Sika announced it, too, would be increasing its previously-imposed surcharges on its products, including CCAs, from sixteen percent (16%) to twenty percent (20%).[157]

106.    These announcements were publicly disseminated and received substantial news coverage.

107.    Indeed, in an article published in August of 2020, an industry consultant noted that despite declining sales in the construction industry, the United States had seen an increase of eleven percent (11%) in the construction-cost-index (CCI), including a four percent (4%) increase in prices for products made of concrete.[158] He explained that "[t]he fall in prices feared in many branches, like automotive or plant engineering, is not noticeable in the construction sector."[159] The

---

[155] Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-priceincrease/#:~:text=GCP%20Applied%20Technologies%20will%20raise, American%20customers%2C%20effective%20January%202022.

[156] Letter from Konrad Wernthaler, Senior Vice President at Master Builders Group, to Customers (Jan. 14, 2022), https://www.glenrockcompany.com/wp-content/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[157] Letter from Michal Mastro, Vice President at Sika, to Customers (Jan. 2022), https://www.glenrockcompany.com/wpcontent/uploads/2022/01/LtrForWebsite-Jasn27_2022.pdf.

[158] ZKG Cement, Smart Pricing Strategies in the Pandemic, https://www.zkg.de/en/artikel/zkg_Smart_pricing_strategies_in_the_pandemic-3562339.html.

[159] Id.

consultant went on to suggest that players in construction-related industries should continue to raise their prices.[160]

108.    The average price of CCAs imported into the United States also climbed exponentially during the Class Period. As shown in the following graph, the prices of imported CCAs remained generally steady between 2010 and 2019 before rising sharply in 2020:

*Import Prices of CCAs ($/kg)*



---

[160] *Id.*

109.    Prices for CCAs imported in the United States and its territories closely track the prices for CCAs exported from European countries. This is shown in the following graph:

| *European Export Prices of CCAs Versus US Import Prices* |
| --- |



110.    Similarly, prices for CCAs imported into the United States and its territories closely track prices for CCAs imported into European countries. This is shown in the following graph:



**European Import Prices of CCAs Versus US Import Prices**



111.    In sum, and as shown above, Defendants' price increases and surcharges have resulted in the prices for CCAs sold in the United States and its territories to increase dramatically during the Class Period. Specifically, prices for CCAs sold in the United States and its territories have roughly doubling during the Class Period.

### 2.    *Normal Market Forces Do Not Explain Defendants' Price Increases or Surcharges*

112.    Defendants have justified their price increases during the Class Period by citing increases in input costs and supply chain constraints. For example, when Master Builders Group

raised prices for its CCAs by as much as 10% in November of 2020, the company blamed "supply constraints in key raw materials" and "an increase in raw material cost and several other related costs including freight." In explaining GCP's decision to raise its CCA prices by 10% in January of 2022, GCP Specialty Construction Chemicals President David Campos stated, "The global supply chain impacts on raw material and freight costs have been unprecedented over the past six months and input costs are not expected to subside in the near-term."[161] RPM's Laroche similarly justified price increases as necessary "to offset significant raw material inflationary pressure."[162]

113.    However, Defendants' material price increases for and imposition of surcharges on CCAs cannot be explained by normal market forces.

114.    As shown in the following graph, the prices for some raw materials for CCAs (aluminum compounds for accelerator, fatty acids for air entrainer, and synthetic organic plasticizers for water reducers) spiked briefly during Covid, but have since fallen dramatically:

---

[161] Concrete Products, Raw Material, Freight Costs Drive GCP Admixture Price Increase (Nov. 29, 2021), https://concreteproducts.com/index.php/2021/11/29/raw-material-freight-costs-drive-gcp-admixture-priceincrease/#:~:text=GCP%20Applied%20Technologies%20will%20raise,American%20customers%2C%20effective%20January%202022.

[162] RPM, Q4 2022 Earnings Call Transcript (July 25, 2022), https://www.rpminc.com/media/3784/rpmusq_transcript_2022-07-25.pdf.

***Prices for Aluminum Compounds (Accelerator), Fatty Acids (AirEntrainer), & Synthetic Organic Plasticizers (Water Reducer)***



115.    Indeed, as shown in the following graph, the prices for sodium lignosulfate used in plasticizers have decreased during the Class Period:[163]


**Price for Sodium Lignosulfonate (Plasticizer)**



116.    Similarly, ocean freight rates spiked sharply and briefly during Covid, particularly for trans-Atlantic cargo, but have since fallen dramatically. This is shown in the following graph:[164]

---

[163] ChemAnalyst, Sodium Lignosulphonate Price Trend and Forecast, https://www.chemanalyst.com/Pricingdata/sodiumlignosulphonate-1140.

[164] Freight Waves, Trans-Atlantic shipping rates keep sinking as imports from Europe fall (Apr. 28, 2023), https://www.freightwaves.com/news/trans-atlantic-shipping-rates-keep-sinking-as-imports-from-europe-fall.

**Ocean Container Freight Rates**

*Figure 14: Ocean Container Freight Rates*



117.    As the above figures show, raw materials cost increases alone do not explain Defendants' astronomical CCA price increases, including surcharges, during the Class Period. The timing and duration of the raw materials cost increases do not fully align with the CCA price increases. Moreover, while some CCA raw materials saw higher prices, others were flat or declined. Similarly, the increase in freight costs during Covid was short-lived, stabilizing after a few months before beginning to decrease. The duration of shipping cost increases does not explain the persistent increase in CCA prices, including surcharges, since 2019.

### 3.    Defendants Have Admitted Normal Market Forces Do Not Explain Their Price Increases or Surcharges

118.    Defendants have admitted that their higher profit margins were driven by price increases that outpaced any increases in input costs.

119.    For example, during Saint-Gobain Group's earnings call in July of 2019, CFO Sreedhar N. noted that Saint-Gobain Group had "remained focused on price in spite of … the fact that there was a lower trend in the inflation."[165] He explained that keeping prices high had helped the company "not only to offset the inflation," but also to maintain a "positive spread" and, therefore, increased profits.[166] Over the next two years, Saint-Gobain Group continued to raise its prices and increase its profits. A press release from October of 2021 explained that Saint-Gobain Group was "confident that it w[ould] be able to offset raw material and energy cost inflation over full-year 2021" given "the sharp 8.7% acceleration in prices" over the previous year, as well as "the new price increase announcements in Europe and in the [United States]."[167]

120.    Similarly, Sika CFO Adrian Widmer admitted during an earnings call in February of 2020 that the impact of increases in raw material costs was "only . . . marginal," and that Sika had continued to improve its material margin by remaining "very much . . . focused on pricing."[168] During another earnings call one year later, Widmer explained that Sika's material margin of 54.8% in 2020 was "supported by *decreasing* raw material costs . . . in combination with disciplined pricing," which allowed it to "add[] 50 basis points in price effect."[169]

---

[165]Compagnie de Saint-Gobain, First-Half 2019 Earnings Call Transcript (Jul. 26, 2019), https://seekingalpha.com/article/4278326-compagnie-de-saint-gobains-codgf-ceo-pierre-andre-de-chalendar-on-first-half-2019-results.

[166] *Id.*

[167] Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saintgobain.com/files/media/document/CP_CA_9M_2021_VA.pdf.

[168] Sika AG, Full Year 2019 Earnings Call Transcript (Feb. 21, 2020), https://seekingalpha.com/article/4326363-sika-agsxyay-ceo-paul-schuler-on-full-year-2019-results-earnings-call-transcript.

[169] Sika AG, Q4 2020 Earnings Call Transcript (Feb. 20, 2021), https://seekingalpha.com/article/4407686-sika-ag-sxyayceo-paul-schuler-on-q4-2020-results-earnings-call-transcript (emphasis added).

121.    RPM's Sullivan bragged about his company's ability to maintain its high pricing when asked whether Euclid Group intended to cut its prices due to recent, slumping demand:  "In the past cycles, we've been able to maintain the vast majority of the price increases that we've initiated, and we would expect to do exactly the same thing here. If you look at our performance in past commodity cycles on the down cycle, we should pick up $100 million to $200 million of margin benefit and we're working hard to do that, and we intend to do it."[170]

122.    Several Defendants have cited their "pricing discipline" in explaining profit margin increases to investors.

123.    For example, Sika CEO Thomas Hasler explained that the "remarkable" increase in Sika's material margin in the first half of 2023 was "a result of our pricing discipline and excellence."[171] This was echoed in Sika's 2023 Half-Year Report, which reported "disciplined sales price management," coupled with lower costs, as improving its gross margin.[172]

124.    Similarly, in an October of 2021 press release, Saint-Gobain Group cited a "[c]onstant focus on the price-cost spread" and "strong pricing discipline amid strong inflation" as its "strategic priorities" for 2021.[173]

125.    And in July of 2023, when an analyst asked RPM's Sullivan what had driven the "significant increase" in profit margin for RPM's construction segment in the prior quarter,

---

[170] RPM, Q2 2023 Earnings Call Transcript (Jan. 5, 2023), https://www.rpminc.com/media/4564/rpm-usq_transcript_2023-01-05.pdf.
[171] Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.
[172] Sika, Half-Year Report (2023), 19 https://www.sika.com/content/dam/dms/corporate/media/glo-hy-2023-half-yearreport.pdf?_gl=1*1smz2e5*_ga*MjA0NzgwMDU4NC4xNjk3ODI0MDYx*_ga_K04G1QB2XC*MTcwMDIzNDU0NC40LjEu MTcwMDIzNDU2OS4wLjAuMA (emphasis added).
[173] Saint-Gobain, Press Release (Oct. 28, 2021), https://www.saint-gobain.com/sites/saintgobain.com/files/media/document/CP_CA_9M_2021_VA.pdf (emphasis added).

Sullivan boasted about Euclid Group's pricing discipline: "[W]e had a few distributors that were hinting at … we can boost some product if you discount. And I think we held our pricing and held our discipline. And let's say everybody held their breath until they needed inventory, and it started showing up in May. And that positive trend is continuing as we enter the first quarter."[174]

### F.    Defendants Have Consolidated Their Control Over CCAs

126.    Defendants have admitted and analysts have pointed out the transformative and continuing CCA industry consolidation in recent years, suggesting it is far from accidental. This consolidation has included acquisitions for billions or hundreds of millions of dollars each, as well as an accumulation of smaller acquisitions, each of which increased the Defendants' market power.

127.    In 2017, when Cinven announced its negotiations to buy Chryso, it mentioned Chryso's appeal was, among other factors, based on "strong market positions in developed and emerging geographies; [and a] successful track record of acquiring and integrating businesses, six in the past two years with further consolidation prospects[.]"[175]

128.    In December 2021, a chemical industry writer began by calling Saint-Gobain's $2.3 billion acquisition of GCP Applied Technologies as "[c]ontinuing consolidation in the construction chemical field[.]"[176]

129.    In June 2023, The Concrete Products website discussed Sika's purchase of MBCC Group and sale of a brand name and MBCC assets in North America, U.K., Europe, Australia, and

---

[174] RPM Q4 2023 Earnings Call Transcript (Jul. 26, 2023), https://www.rpminc.com/media/4837/rpm-q4-23-transcript.pdf (emphasis added).

[175] *Construction Market Prospects Pique Investors Interest in Chryso Group,* Cement Products (March 28, 2017), https://concreteproducts.com/index.php/2017/03/28/construction-market-prospects-pique-investor-s-interest-in-chryso-group/ (accessed December 8, 2023).

[176] Craig Bettenhausen, *Saint-Gobain to Buy Construction Chemical Maker GCP for $2.3 Billion,* c&en (Dec. 7, 2021), https://cen.acs.org/business/specialty-chemicals/Saint-Gobain-buy-construction-chemical/99/web/2021/12 (accessed December 12, 2023).

New Zealand to Civen Ltd. The website described these transaction as "both continuing a global concrete admixtures transformation that began with 2021-22 Saint-Gobain Group deals for Chryso Group and GCP Applied Technologies."[177]

130.    Discussing Sika in January 2023, an analyst stated, "[h]owever, it is important to note that not all growth is organic, and approximately 50% of all [Sika's] revenue growth is anticipated to be the result of acquisitions."[178]

131.    In Sika's earnings call for the second quarter of 2023, its Chief Financial Officer and board member Arian Widmer mentioned antitrust processes "running in the background" during its acquisition of MBCC and said other acquisitions were more difficult during that large acquisition, but Sika was not "changing in strategy or slowing down our acquisition pipeline and [it] remains quite robust and there will be more to come."[179]

132.    Beginning at least as early as 2014, Compagnie de Saint-Gobain S.A. launched a hostile takeover of Sika AG.[180] Between 2014 and 2018, Compagnie de Saint-Gobain S.A. acquired almost 25% of Sika AG's stock and was the single largest shareholder.[181] However, on

---

[177] *Sika Closes Master Builders Deal With Former Chryso Underwriter*, concrete products (June 15, 2023), https://concreteproducts.com/index.php/2023/06/15/sika-closes-master-builders-deal-with-former-chryso-underwriter/ (accessed December 8, 2023).

[178] *Sika AG:  Leveraging Global Expansion*, Seekingalpha (Jan. 31, 2023), https://seekingalpha.com/article/4573729-sika-ag-leveraging-global-expansion (accessed December 8, 2023).

[179] *Sika AG Q2  2023 Earnings Call Transcript* strike market (Aug. 3, 2023), https://strike.market/stocks/SXYAY/earnings-call-transcripts/221804 (accessed December 13, 2023).

[180] *Saint-Gobain Remains Committed to Deal to Take over Sika*, https://www.reuters.com/article/us-sika-cie-saint-gobainidUSKBN1300II (last updated Nov. 5, 2016).

[181] Market Watch, *Saint-Gobain, Sika and Burkard Family End Dispute* (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; VY Tyndall Global Select

May 11, 2018, Compagnie de Saint-Gobain S.A. abandoned its takeover attempt, and agreed to reduce its stake to more than ten percent, which it agreed to hold for at least two years.[182] Before selling its Sika AG stock in 2020, Compagnie de Saint-Gobain S.A. was the largest shareholder in Sika AG.[183]

133.    As this merger began to falter, Compagnie de Saint-Gobain S.A. and Sika AG, through their shared ownership and financial interests, began a coordinated campaign of buying up their smaller competitors. At all times, these efforts were aided and abetted by Cinven, a private equity firm with substantial investments in the CCA space. Euclid Group joined in its co-conspirators' consolidation efforts no later than April of 2022.

134.    With regard to Compagnie de Saint-Gobain S.A. and beginning in March of 2017, Cinven acquired Chryso.[184] In the months that followed, Chryso, under Cinven's ownership and

---

Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wp-content/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; *Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle*, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formally-ending-bitter-takeover-battleidUSKBN2331J1 (last updated May 27, 2020).

[182] Market Watch, *Saint-Gobain, Sika and Burkard Family End Dispute* (May 11, 2018), https://www.marketwatch.com/story/saint-gobain-sika-and-burkard-family-end-dispute-2018-05-11; Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-deal-will-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021).

[183] VY Tyndall Global Select Fund Commentary, 5 (Oct. 2019), https://www.tyndallim.co.uk/wpcontent/uploads/2019/11/1910-VT-Tyndall-Global-Select-Fund-Commentary.pdf; *Saint-Gobain Sells Sika Stake, Formally Ending Bitter Takeover Battle*, https://www.reuters.com/article/us-sika-m-a-saintgobain/saint-gobain-sells-sika-stake-formallyending-bitter-takeover-battle-idUSKBN2331J1 (last updated May 27, 2020).

[184] CHRYSO, *Completion of the Acquisition of Chryso by Cinven* (July 8, 2017), https://www.chrysogulf.com/news/83/completion-of-the-acquisition-of-chryso-by-cinven.

control, acquired at least four competing CCA manufacturers,[185] including Italy's Ruredil in June of 2018[186], Portugal's Euromodal in October of 2018[187], Ireland's Chemtec in October of 2018[188], and Morocco's Aptex in October of 2020.[189] Compagnie de Saint-Gobain S.A. acquired Chryso from Cinven in September of 2021, and then, just three months later, in December of 2021, acquired GCP.[190]

135.    Compagnie de Saint-Gobain S.A. subsequently consolidated its management of these earlier-competitors under the control of a newly-created "Construction Chemicals Business Unit" and appointed the incumbent Chryso President, Steve Williams, as the President of this unit,[191] and incumbent Chryso CEO, Thierry Bernard (who was previously employed by Cinven),

---

[185] Cinven, *Cinven to Sell Chryso to Saint Gobain* (May 20, 2021), https://www.cinven.com/media/news/cinven-to-sellchryso-to-saint-gobain; *Cinven Completes Acquisition of Chryso*, Private Equity News (June 28, 2017), https://www.private-equitynews.com/news/cinven-completes-acquisition-of-chryso/ (accessed December 13, 2023)

[186] *Cinven, Chryso to Acquire Certain Ruredil assets and Enlarges its Offering for Construction Materials in Italy* (June 28,2018), https://www.cinven.com/media/news/chryso-to-acquire-certain-ruredil-assets-and-enlarges-its-offering-for-constructionmaterials-in-italy/.

[187] Cinven, *Chryso Acquires Euromodal and Enlarges its Offering for Construction Materials in Portugal* (Oct. 19, 2018), https://www.cinven.com/media/news/chryso-acquires-euromodal-and-enlarges-its-offering-for-construction-materials-inportugal/.

[188] CHRYSO, *Chryso Acquires Chemtec Admixtures Limited in Ireland* (Oct. 3, 2018), https://uk.chryso.com/news/195/chryso-acquires-chemtec-admixtures-limited-in-ireland.

[189] CHRYSO, *Chryso Strengthens its Presence in Morocco with Aptex* (Oct. 15, 2020), https://www.chryso.com/news/chryso-strengthens-its-presence-in-morocco-with-aptex/.

[190] Chemical & Engineering News, *Saint-Gobain to Buy Construction Chemical Maker GCP for $2.3 Billion* (Dec. 7, 2021), https://cen.acs.org/business/specialty-chemicals/Saint-Gobain-buy-construction-chemical/99/web/2021/12.

[191] Business Wire, *Steve Williams Appointed President of the Newly Created Construction Chemicals Business Unit for North America* (Oct. 17, 2022), https://www.businesswire.com/news/home/20221012005926/en/Steve-Williams-Appointed-President-of-the-Newly-Created-Construction-Chemicals-Business-Unit-for-North-America.

as the General Manager of this unit.[192] Compagnie de Saint-Gobain S.A. has combined Chryso and GCP's manufacturing and sale of CCAs, such that these former competitors now operate as a single, combined unit.[193]

136.    With regard to Sika AG and beginning in late 2018, Sika AG expressed an interest in acquiring Master Builders Group, which at the time, was owned by BASF.[194] But after acquiring another major competitor in the CCA space — France's Parex — in January of 2019,[195] Sika AG initially abandoned its interest in Master Builders Group because, according to its CEO, it did "not believe a deal for all the company would be possible because of anti-trust concerns by regulators."[196] BASF eventually sold Master Builders Group to another hedge fund (Lone Star) for € 3.17 billion, the sale of which closed in the third quarter of 2020.[197]

---

[192] CHRYSO, *New Business Unit Within Saint-Gobain High Performance Solutions: Constructions Chemicals* (Oct. 3, 2022), https://www.chryso.com/news/new-business-unit-within-saint-gobain-high-performance-solutions-constructionchemicals/.
[193] Concrete Products, *Saint-Gobain Institutes Integrated Chryso, GCP Production Strategy* (July 3, 2023), https://concreteproducts.com/index.php/2023/07/03/saint-gobain-institutes-integrated-chryso-gcp-production-strategy/; Concrete Products, *Saint-Gobain Proceeds with Integrated Chryso, GCP Production* (Aug. 14, 2023).
[194] *Sika Interested in Parts of BASF's Construction Chemical Business*, https://www.reuters.com/article/us-sika-ceobasf/sika-interested-in-parts-of-basfs-construction-chemicals-business-idUSKCN1QB1CP (last updated Feb. 22, 2019).
[195] *CVC, Sika Makes Binding Offer to Acquire Parex* (Jan. 8, 2019), https://www.cvc.com/media/news/2019/2019-01-08-sika-makes-binding-offer-to-acquire-parex/.
[196] *BRIEF-Sika CEO Rules out Deal for Whole BASF Construction Chemical Business*, https://www.reuters.com/article/brief-sika-ceo-rules-out-deal-for-whole/brief-sika-ceo-rules-out-deal-for-whole-basfconstruction-chemical-business-idUKZ8N1UN017 (last updated Jan. 8, 2019).
[197] Concrete Construction, *Lone Star Funds to Acquire Master Builders* (Dec. 27, 2019), https://www.concreteconstruction.net/products/concrete-construction-materials/lone-star-funds-to-acquire-masterbuilders_c#:~:text=BASF%20has%20finally%20found%20a,of%20BASF's%20Construction%20Chemicals%20business.

137.    Then, just one year later, in November of 2021, Sika AG announced that it would acquire Master Builders Group for $5.9 billion – nearly double what Lone Star had paid for it.[198] However, due to "competition concerns" raised by the UK's CMA, Cinven (which, as noted above, had just sold Chryso to Compagnie de Saint-Gobain S.A.) acquired MBSD's United States assets, including MBSA, in early 2023.[199] Specifically, MBSD's assets were split into two parts: the first, which encompassed MBSD's assets in the UK, United States, Canada, Europe, Australia, and New Zealand, was sold to Cinven; and the second, which encompassed MBSD's assets in the rest of the World, was sold to Sika AG. While this arrangement appeared to appease antitrust regulators around the World, it was soon revealed that it yielded anticompetitive effects. Sika has admitted that it views Cinven as its partner, not its competitor. Remarking on the spin-off, Sika's CEO, Thomas Hasler, remarked, "Cinven with its extensive expertise in this sector is an ideal partner for continuing the successful growth path of this business. . . ."[200] Hasler also bragged about Sika's dominance in the concrete admixture industry following the deal with MBSD, stating that its "product offering in the segment of concrete admixture is super strong and almost [] unchallengeable by others because we now have really the full innovation pipe-line for the future ready and also very strong backup with the supply chain that is coming together."[201]

---

[198] Chemical Engineering, *Sika to Acquire MBCC Group for €5.2 billion* (Nov. 11, 2021), https://www.chemengonline.com/sika-to-acquire-mbcc-group-for-e5-2-billion/?printmode=1.
[199] Adhesives & Sealants Industry, *Sika to Sell MBCC Group's Chemical Admixture Assets to Cinven* (Mar. 27, 2023), https://www.adhesivesmag.com/articles/100079-sika-to-sell-mbcc-groups-chemical-admixture-assets-to-cinven.
[200] Saint-Gobain's U.S. Deal will Cement its Sika Envy, https://www.reuters.com/breakingviews/saint-gobains-us-dealwill-cement-its-sika-envy-2021-12-06/ (last updated Dec. 6, 2021) (emphasis added).
[201] Sika AG, Q2 2023 Earnings Call Transcript (Aug. 4, 2023), https://seekingalpha.com/article/4624149-sika-ag-sxyay-q2-2023-earnings-call-transcript.

138.    In the Euclid Group, in November of 2021, RPM acquired J.W. Brett Inc. d/b/a Brett Admixtures, and in April of 2022,[202] RPM acquired Chryso's North American cement grinding aids and additives business from Saint-Gobain Group.[203]

139.    The following timeline shows the timing of Defendants' acquisitions:



**Timeline of Defendants' CCA Acquisitions**



140.    Sika AG, Compagnie de Saint-Gobain S.A., and RPM's expensive acquisitions of their competitors at a time when raw material costs for CCAs were allegedly skyrocketing makes little economic sense absent a conspiracy to artificially inflate the price of CCAs, such as that alleged here. Indeed, the huge sums paid for these competitors is all the more surprising in light of the trouble that BASF had in unloading Master Builders Group a short time prior.

---

[202] RPM International, Proxy Statement (Aug. 24, 2022),
https://www.rpminc.com/media/3815/proxy-statement.pdf.
[203] *Id.*

G. **The Structure and Characteristics of the Market for CCAs Support the Existence of a Conspiracy**

141.     The structure and other characteristics of the market for CCAs make it conducive to anticompetitive conduct among Defendants and make collusion particularly attractive.

### *1. Defendants Dominate The CCA Market*

142.     The presence of a small group of major sellers is one of the conditions that the DOJ has identified as being favorable to collusion.[204] Put differently, a highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

143.     As the DOJ has noted, "mergers can reduce choices for consumers, workers, and other businesses, leaving them increasingly dependent on larger and more powerful firms that have purchased greater power to dictate the terms of their deals."[205] Indeed, the DOJ updated its Merger Guidelines in 2023 to better address the economic consequences of anticompetitive mergers because, as Attorney General Merrick Garland noted, "unchecked consolidation threatens the free and fair markets upon which our economy is based."[206]

144.     The Defendants that were targeted in dawn raids by European antitrust regulators, Defendants Sika, Saint-Gobain Group, and Master Builders Group, are among the largest producers of CCAs in the World, as well as in the United States and its territories.[207] On

---

[204] Justice.gov, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[205] Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and Federal Trade Commission Seek to Strengthen Enforcement Against Illegal Mergers (Jan. 18, 2022), https://www.justice.gov/opa/pr/justice-department-andfederal-trade-commission-seek-strengthen-enforcement-against-illegal (emphasis added).

[206] Press Release, Office of Public Affairs, U.S. Department of Justice, Justice Department and FTC Seek Comment on Draft Merger Guidelines (July 19, 2023), https://www.justice.gov/opa/pr/justice-department-and-ftc-seek-comment-draft-mergerguidelines.

[207] Industry ARC, Concrete Admixtures Market – Forecast 2023–2028, https://www.industryarc.com/Report/15114/concrete-admixturesmarket.

information and belief, Plaintiff's estimate of Defendants' market share in the United States is between eighty and ninety percent (80% to 90%)[208]

145.    Other manufacturers of CCAs do not meaningfully compete with Defendants. Several of these other, smaller manufacturers of CCAs told the CMA that even if they wanted to compete with the Defendants, they would not be able to do so effectively because of challenges in scaling up their operations, as well as the reluctance of CCA purchasers to switch from their existing CCA manufacturer(s).[209]

146.    In fact, at least some of the Defendants' internal s indicate that they consider the other Defendants to be their only close competitors.[210]

147.    Because manufacturing CCAs is highly concentrated, with the Defendants controlling the vast majority of production, this market is highly susceptible to collusion.

### 2.    *Barriers to Entry Are High*

148.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market.

149.    There are high barriers to entry to effectively compete in the manufacture of CCAs, including the following: (a) the time and cost associated with effectively scaling CCAs

---

html#:~:text=Major%20players%20in%20the%20Concrete,ve%20Tic.&file=/fileadmin/symrise/Downloads_reports/reports/documents/2023/230308-Symrise-Financial-Report-2022.pdf#page=14.

[208] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 75 (Sept. 23, 2022).

[209] *Id.* at ¶¶ 107. 113, 118; CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶¶ 112, 116, 123 (Sept. 22, 2022).

[210] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 89, 96, 101 (Sept. 23, 2022); CMA, Decision on Relevant Merger Situation and Substantial Lessening of Competition, ¶¶ 91, 101, 106 (Sept. 22, 2022).

manufacturing operations (i.e., building new production and storage facilities in closer proximity to CCA purchasers); (b) the research and development investment required to develop new products (i.e., polymers), and then support their introduction into the market; (c) sellers of the raw materials necessary to manufacture CCAs (i.e., polymers) favor the larger, entrenched manufacturers of CCAs; and (d) the long-standing, existing relationships between CCA manufacturers and customers.[211]

150.    These high barriers to entry are amplified by the difficulty purchasers of CCAs have in switching manufacturers once selected. This is because smaller suppliers of CCAs cannot quickly build up their scale and capacity for potentially-switching customers,[212] and because supply contracts typically have a term of one to three years.[213] Purchasers of CCAs thus face switching costs and are frequently locked-in to purchasing CCAs from the Defendants in this case–the three largest manufacturers and sellers of CCAs in the World, including in the United States and its territories.[214]

151.    The CMA, in determining that the acquisition by Sika AG of MBSD would be anticompetitive, noted as follows: "There are significant barriers to entry and expansion and, although a number of suppliers have expansion plans, these will not have a significant enough effect on the structure of the market to prevent an SLC ["Substantial Lessening of Competition"] even if these plans materialise."[215]

---

[211] *Id.* at ¶ 128.
[212] *Id.* at ¶ 50.
[213] CMA, Initial Report, ¶6.50 (Oct. 25, 2022).
[214] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 50 (Sept. 23, 2022).
[215] CMA, Anticipated Acquisition by Sika AG of MBCC, Group Decision to Refer (Aug. 10, 2022), https://assets.publishing.service.gov.uk/media/63469a408fa8f53465d139b4/Decision_to_refer_full_text__Sika-MBCC_.pdf.

152.    The high barriers to entry in the manufacture of CCAs make it unlikely that supra-competitive prices would result in new competitors entering the market. These high barriers to entry also make the market more susceptible to collusion.

### 3.    Defendants Sell Homogenous Commodity Products

153.    "Basically, concrete is obtained by a homogenous mixture of cement, water, aggregate, and auxiliary chemical additives using a certain production technology."[216] The United Kingdom's CCP found that chemical admixtures "are commodities and homogenous products[.]"[217]

154.    When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier to unlawfully agree on the price for the product in question, and it is easier for producers to monitor agreed-upon prices effectively. This makes it easier for the producers to form and sustain an unlawful cartel.

155.    Defendants manufacture and sell numerous CCAs in the United States and its territories, as well as around the World. Purchasers of CCAs in the United States and its territories import them directly from the foreign Defendants (e.g., Compagnie de Saint-Gobain S.A., Sika AG, and MBSD) and buy them from their domestic subsidiaries (e.g., Sika Corp., Chryso, GCP,

---

[216] *What Is Concrete and What Is In It?* Baumerk Construction Chemicals, https://www.baumerk.com/en/blog/what-is-concrete (accessed December 5, 2023).

[217] Decision on Relegant Merger Situation and Substantial Lessening of Competition ¶ 91(a), *Anticipated Acquisition by Sika AG of MBCC Group,* No. ME/6984/22 (Competition & Markets Authority (July 27, 2022), https://assets.publishing.service.gov.uk/media/632c80f78fa8f51d2cfed942/220727_Sika-MBCC_Decision_FINAL2.pdf (accessed December 5, 2023). https://assets.publishing.service.gov.uk/media/632c80f78fa8f51d2cfed942/220727_Sika-MBCC_Decision_FINAL2.pdf

and MBSA).[218] The below figures list some of the CCAs sold in the United States and its territories by Defendants.

156.    The following table lists some of the CCAs sold by Sika in the United States and its territories:

| CCAs Sold by Sika | | | |
|---|---|---|---|
| Chromix | SikuaMultiAir | SikaViscoFlow | SikaMix |
| SikaAEA | SikaPlastiment | Sika Watertight Concrete Powder | SikaPlast |
| SikaAir | SikaPlastocrete | SikaWT | SikaQuick Winter Boost |
| SikaAntisol | SikaRapid | SikaColor | SikaSet |
| SikaCem | SikaRugasol | SikaControl | SikaTard |
| SikaCem Summer Extender | SikaSigunit | Sikacrete | SolarChrome |
| SikaCNI | SikaStabilizer | Sikament | ViscoCrete |
| SikaGrind | SikaFerroGard | Sika Lightcrete Powder | Sika Lightcrete Liquid |

---

[218] CMA, Phase 1 Referral Decision in Sika-Master Builders Merger, ¶ 124(b) (Sept. 23, 2022).

157.    The following table shows some of the CCAs sold by Saint-Gobain Group in the

United States and its territories:

| CCAs Sold by Saint-Gobain Group |
|---|

| Chryso | | | |
|---|---|---|---|
| CHRYSO Air | CHRYSO Aqua | CHRYSO CI | CHRYSO Control |
| CHRYSO DSF | CHRYSO Fluid Prmia | CHRYSO NutralSet | CHRYSO Optima |
| CHRYSO Optifinish | CHRYSO PorTite | CHRYSO Plast | CHRYSO Premia |
| CHRYSO Quad | CHRYSO QuadEMx | CHRYSO Serenis | CHRYSO Tard |
| CHRYSO TurboCast | — | — | — |

| GCP | | | |
|---|---|---|---|
| Adva | Daratard | Force | RDA |
| Airalon | Daravair | Hydrophobe | Recover |
| Clarena | Darex | Mira | Synchro |
| Daraccel | DCI | Optec | Tavero |
| Daracem | Dry-Block Admixture | Polarset | Terapave |
| DaraFill | Dry-Block Mortar Admixture | Postrite | Tyronix |
| Darapel | Eclipse | Quantec | Tytron |
| Daraset | FXP | Fasir | V-Mar |
| WRDA | Zyla | — | — |

69

158.    The following table shows some of the CCAs sold by Master Builders Group in the United States and its territories:

| CCAs Sold by Master Builders Group | | | |
|---|---|---|---|
| MasterAir | MasterGlenium | Master Polyheed | MasterSet |
| MasterCast | MasterLife | MasterPozzolith | MasterSure |
| MasterCell | MasterMatrix | MasterRheobuild | Master X-Seed |
| MasterColor | MasterPel | — | — |

159.    The following table shows some of the CCAs sold by Euclid Group in the United States and its territories:

| CCAs Sold by Euclid | | | |
|---|---|---|---|
| Accelguard | Cucon Barracade | Eucon MRX | Eucon Retarder |
| Conex | Eucon BCN | Eucon NR | Eucon WRX |
| Eucon 37 | Eucon CIA | Eucon NW | Eucon X |
| Eucon 1037 | Eucon DS | Eucon SE | Eucon SRA |
| Eucon 537 | Eucon Easy Fill | Eucon SP | Eucon Stasis |
| Eucon A+ | Eucon Integral ARC | Eucon Sureshot | Eucon WR |
| Eucon ABS | Eucon LR | Eucon Vandex | Plastol |
| Eucon Air | Eucon LW | Eucon WO | Visctrol |
| Eucon AWA | Eucon MR | ___ | ___ |

70

### 4.    *CCA Buyers Are Unconcentrated*

160.    The unconcentrated nature of the demand side of the CCA market also makes this market susceptible to collusion.

161.    In 2021, there were nearly 9,000 concrete and cement product manufacturing establishments in the United States and its territories.[219]

162.    Such a large number of buyers, each of whom forms a small share of the total marketplace, means that there is less incentive for Defendants to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

### 5.    *Demand for CCAs Is Inelastic*

163.    Industries with inelastic demand are more susceptible to cartel behavior because of the potential for large increases in revenue resulting from the higher cartel prices. There are three primary characteristics that demonstrate the inelasticity of demand for CCAs: (a) a lack of substitute goods, (b) the essential nature of CCAs in cement, concrete, and mortar, and (c) CCAs being a small portion of the overall cost of the final good.

### a)    <u>There are no substitutes for CCAs</u>

164.    The DOJ has also recognized that standardized products which lack substitutes is a condition favorable to collusion, since substitute goods can serve to restrain price increases and temper the effects of a price-fixing conspiracy.[220]

---

[219] Census.Gov, 2021 County Business Patterns (CBP) Data, https://www.census.gov/programssurveys/cbp/data/tables.html (last updated May 19, 2022).
[220] Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For (justice.gov), https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

165.    Purchasers of CCAs do not view different kinds of CCAs as interchangeable, nor do purchasers view them as being substitutes for other kinds of CCAs.[221]

166.    In addition, and as set forth above, purchasers of CCAs face high switching costs as between specific CCAs. This is the case for at least three reasons. First, "extensive testing is required to ensure that any new [CCA] products are suitable for [the customer's] particular ag-gegates and requirements, with this process becoming more difficult the larger and more complex a [CCA] customer's operations are."[222] Second, purchasers of CCAs frequently have to obtain their own customers' approval before switching CCAs.[223] Third, purchasers of CCAs frequently must train their employees on how to use new CCAs before those CCAs can be used.[224]

167.    The lack of substitute goods makes this market susceptible to collusion.

### b)    CCA's Are a Necessity

168.    CCAs are perceived by purchasers as providing economic, commercial, and environmental benefits to the cement, concrete, and mortars that incorporate them. They are therefore viewed as essential to projects involving concrete, cement, and/or mortar.[225]

169.    Purchasers of CCAs are thus unable to respond to price increases by buying less.

170.    Purchasers' need for CCAs also makes this market more susceptible to collusion.

### c)    CCAs Comprise a Small Share of the Cost of the Final Product

171.    CCAs typically make up only about one percent (1%) to seven percent (7%) of the over-all cost of the finished products in which they are used.[226]

---

[221] *Id.* at ¶¶ 53-64.
[222] *Id.* at ¶ 11.
[223] *Id.* at ¶ 51.
[224] *Id.* at ¶ 50.
[225] "Sika's product offering is…essential to their end users…" (VY Tyndall Global Select Fund Commentary, October 2019, p. 4); *see also* 2022.10.25_Sika-MBCC_CMA Initial Report at ¶ 6 .30-6.31.
[226] 2022.10.25_Sika-MBCC_CMA Initial Report at ¶ 6.32.

172.    As a result, CCA price increases do not, in general, reduce how much product the Defendants' customers purchase, or the revenue that Defendants make on their sales of CCAs.

173.    This also makes this market especially susceptible to collusion.

**H.    Defendants Fraudulently Concealed Their Conduct**

174.    Plaintiff had no knowledge of the Defendants' anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until, at the earliest, October 17, 2023, when the EC announced its investigation into the Defendants and that it was coordinating with the TCA, CMA, and DOJ. As a result, Plaintiff did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date. Prior to October 17, 2023, there was insufficient information to suggest that the Defendants were involved in a conspiracy to fix prices for CCAs.

175.    Therefore, the statute of limitations on the claims asserted herein was tolled by fraudulent concealment until at least October 17, 2023. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the beginning of the Class Period.

176.    Defendants' conspiracy was inherently self-concealing. The success of the conspiracy depended on the Defendants and their co-conspirators keeping the price-fixing conduct alleged herein secret from customers and government authorities. Plaintiff reasonably believed it was purchasing CCAs in a competitive industry.

177.    Defendants and their co-conspirators also took affirmative steps to conceal the conspiracy and carry it out in a manner that would evade detection. For example, each Defendant has a "Code of Conduct" that appears to prohibit exactly the type of conduct they engaged in

here.[227] Further, as described above, Defendants gave other reasons for their price increases, such as blaming supply chain impacts, raw material costs, and freight costs.

178.    Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff did not learn or discover the operative facts giving rise to its claims until October 17, 2023. No information, actual or constructive, was ever made available to Plaintiff that would have led a reasonably diligent person to investigate whether a conspiracy in the market for CCAs existed prior to October 17, 2023.

179.    Moreover, because Plaintiff could not have discovered the existence of its claims prior to October 17, 2023, Plaintiff's claims did not accrue until that date.

## V.    CLASS ACTION ALLEGATIONS

180.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the following class (the "Nationwide Class") seeking equitable and injunctive relief:

> All persons and entities that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale, where the person or entity purchased in the United States during the Class Period.

181.    Plaintiff also brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure, Rule 23(a) and (b)(3) seeking damages pursuant to antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following Class (the "Nationwide Damages Class"):

> All persons and entities that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own

---

[227] Sika, Code of Conduct (May 1, 2021), https://www.sika.com/content/dam/dms/corporate/v/glo-code-of-conduct.pdf; Saint-Gobain Group, General Principles of Conduct and Action, https://www.saint-gobain.com/sites/saintgobain.com/files/principles_en.pdf; Master Builders Group, Code of Conduct, https://assets.master-builders-solutions.com/englobal/master%20builders%20solutions%20group%20code%20of%20conduct.pdf; RPM, The Values & Expectations of 168 (Apr. 2018), https://www.rpminc.com/media/2114/v_es_final_version_for_the_board_meeting_april_2018.pdf.

use and not for resale, where the person or entity purchased in an Indirect Purchaser State[228] during the Class Period.

182.    Alternately to the Nationwide Damages Class, Plaintiff also brings this action on behalf of the following Statewide Damages Classes:

a.  **Arizona Class:**  All persons and entities in Arizona that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

b.  **Arkansas:**  All persons and entities in Arkansas that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

c.  **California Class:**  All persons and entities in California that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

d.  **Connecticut Class**:  All persons and entities in Connecticut that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

e.  **District of Columbia Class:**  All persons and entities in the District of Columbia that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

---

[228] The "Indirect Purchaser States" as listed below in Counts II, III, and IV are:  Arizona, Arkansas, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

f. **<u>Illinois:</u>** All persons and entities in Illinois that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

g. **<u>Iowa:</u>** All persons and entities in Iowa that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

h. **<u>Kansas:</u>** All persons and entities in Kansas that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

i. **<u>Maine:</u>** All persons and entities in Maine that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

j. **<u>Michigan:</u>** All persons and entities in Michigan that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

k. **<u>Minnesota:</u>** All persons and entities in Minnesota that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

l. **<u>Mississippi:</u>** All persons and entities in Mississippi that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

m. **Nebraska:**  All persons and entities in Nebraska that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

n. **Nevada:**  All persons and entities in Nevada that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

o. **New Hampshire:**  All persons and entities in New Hampshire that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

p. **New Mexico:**  All persons and entities in New Mexico that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

q. **New York:**  All persons and entities in New York that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

r. **North Carolina:**  All persons and entities in North Carolina that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

s. **North Dakota:**  All persons and entities in North Dakota that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

t. **<u>Oregon:</u>**  All persons and entities in Oregon that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

u. **<u>Rhode Island:</u>**  All persons and entities in Rhode Island that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

v. **<u>South Carolina:</u>**  All persons and entities in South Carolina that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

w. **<u>South Dakota:</u>**  All persons and entities in South Dakota that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

x. **<u>Tennessee:</u>**  All persons and entities in Tennessee that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

y. **<u>Utah:</u>**  All persons and entities in Utah that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

z. **<u>Vermont:</u>**  All persons and entities in Vermont that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

aa. **West Virginia:** All persons and entities in West Virginia that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

bb. **Wisconsin:** All persons and entities in Wisconsin that purchased CCAs other than directly from Defendants or alleged co-conspirators for the purchasers' own use and not for resale during the Class Period.

183.    The Nationwide Class, Nationwide Damages Class and the Statewide Damages Classes are referred to collectively as the "Classes" unless otherwise indicated. Combinations of the Nationwide Damages Class and one or more of the Statewide Damages Classes together are referred to as "Damages Classes." Specifically excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities, the Court and its staff, and persons who purchased CCAs directly from Defendants.

184.    **Numerosity.** While Plaintiff does not know the exact number of members of the Classes, Plaintiff believes each of the Classes have thousands of members and the class size is so numerous that joinder is impracticable given Defendants' substantial nationwide presence.

185.    **Commonality.** Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Classes, thereby making relief appropriate with respect to the Classes as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of CCAs in the United States;

b)      The identity of the participants of the alleged conspiracy;

c)      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d)      Whether the alleged conspiracy violated federal antitrust laws and/or state antitrust, unfair competition, and/or consumer protection laws, as alleged in the following Claims for Relief;

e)      Whether the Defendants unjustly enriched themselves to the detriment of Plaintiff and the Classes, thereby entitling Plaintiff and other Class Members to disgorgement of all benefits derived by Defendants from their misconduct, as alleged in the following Claims for Relief;

f)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

g)      The effect of the alleged conspiracy on the price of CCAs during the Class Period;

h)      Whether Plaintiff and the Class Members had any reason to know or suspect the conspiracy or any means to discover the conspiracy;

i)      Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Classes;

j)      The appropriate injunctive and related equitable relief for Plaintiff and the

Classes; and

k)      The appropriate class-wide measure of damages.

186.    **Typicality.** Plaintiff's claims are typical of the claims of Class Members, and

Plaintiff and undersigned counsel will fairly and adequately protect the interests of the Classes.

Plaintiff and all members of the Classes are similarly affected by Defendants' unlawful conduct in

that they paid artificially inflated prices for CCAs from Defendants and/or their co-conspirators.

187.    **Adequacy.** Plaintiff's claims arise out of the same common course of conduct

giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident

with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by

competent counsel who are experienced in the prosecution of antitrust and class action litigation.

188.    **Predominance.** The questions of law and fact common to the Class Members

predominate over any questions affecting only individual members, including legal and factual

issues relating to liability and damages.

189.    **Superiority.** Class action treatment is a superior method for the fair and efficient

adjudication of the controversy, in that, among other things, such treatment will permit a large

number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently and without the unnecessary duplication of evidence, effort and

expense that numerous individual actions would engender. The benefits of proceeding through the

class mechanism, including providing injured persons or entities with a method for obtaining

redress for claims that it might not be practicable to pursue individually, substantially outweigh

any difficulties that may arise in management of this class action.

190.    Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    INTERSTATE TRADE AND COMMERCE

191.    Billions of dollars of transactions in CCAs are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

192.    Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories. Defendants own facilities in the United States and therefore made and sold products in the United States, and, based on the above allegations about CCA import prices, Defendants imported other products into the United States.

193.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for CCAs in the United States.

194.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of CCAs sold in the United States, the prices of CCAs would have been determined by a competitive, efficient market.

## VII.    ANTITRUST INJURY

195.    Defendants' antitrust conspiracy had the following effects, among others:

a)    Price competition has been restrained or eliminated with respect to the pricing of CCAs;

b)    The prices of CCAs have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c)    Purchasers of CCAs have been deprived of the benefits of free and open competition; and

d)    Purchasers of CCAs paid artificially inflated prices.

196.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of CCAs.

197.    The precise amount of the overcharge impacting the prices of CCAs paid by Plaintiff and the Classes can be measured and quantified using well-accepted models.

198.    By reason of the alleged violations of the antitrust laws, Plaintiff and the other members of the Classes have sustained injury to their businesses or property, having paid higher prices for CCAs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   CAUSES OF ACTION

### COUNT I
### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

### (Conspiracy in Restraint of Trade)

199.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

200.    From at least May 11, 2018, until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or

conspiracy with regards to CCAs in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

201.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for CCAs, including surcharges on CCAs, in the United States.

202.    In formulating and effectuating this conspiracy, based on the foregoing allegations and on information and belief, Defendants and their co-conspirators did those things that they combined and conspired to do, including the following:

a)    exchanging competitively sensitive information among themselves, with the aim to fix, raise, stabilize, or maintain prices of CCAs, including surcharges on CCAs in the United States;

b)    participating in meetings and conversations among themselves during which they agreed to fix, raise, stabilize, or maintain prices of CCAs in the United States; and

c)    participating in meetings and conversations among themselves to implement, adhere to, and police the agreements they reached.

203.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, stabilize, or maintain prices of CCAs.

204.    Defendants' conspiracy had the following effects, among others:

a)    Price competition in the market for CCAs has been restrained, suppressed, and/or eliminated;

b)      Prices for CCAs provided by Defendants and their co-conspirators have been fixed, raised, stabilized, or maintained at artificially high, non-competitive levels throughout the United States; and

c)      Plaintiff and members of the Classes who purchased CCAs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

205.    Plaintiff and members of the Classes have been injured and will continue to be injured in their business and property by paying more for CCAs purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

206.    The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

207.    Plaintiff and members of the Classes are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Violations of the State Antitrust Statutes

208.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

209.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of CCAs in an unreasonable restraint of trade in commerce, in violation of the various antitrust statutes set forth below.

210.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for CCAs.

211.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Damages Classes who purchased CCAs have been harmed by being forced to pay artificially inflated, supra-competitive prices for CCAs.

212.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws pleaded below.

213.    **Arizona:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Ariz. Rev. Stat. §§ 44-1402, *et seq.*** with respect to purchases of CCAs in Arizona by Class Members and/or purchases by Arizona residents.

    a.   Defendants' combination or conspiracy had the following effects:  (1) CCA price competition was restrained, suppressed, and eliminated throughout Arizona; (2) CCA prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    b.   During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.   Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, members of the Damages Classes seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1402, *et seq.*

214.    **California:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Cal. Bus. And Prof. Code, §§ 16720, *et seq.*** with respect to purchases of CCAs in California by Class Members and/or purchases by California residents.

a.  During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of CCAs at supra-competitive levels.

b.  The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of CCAs.

c.  For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:  (1) fixing, raising, stabilizing, and pegging the price of CCAs.

d.  The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition in the sale of CCAs has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for CCAs sold by Defendants have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased CCAs other than directly from Defendants have been deprived of the benefit of free and open competition.

e.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property in that they paid more for CCAs than they otherwise would have paid in the absence of Defendants'

unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, members of the Damages Classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

215.    **Connecticut:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Conn. Gen. Stat. Ann. §§ 35-26,** *et seq.* with respect to purchases of CCAs in Connecticut by Class Members and/or purchases by Connecticut residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Connecticut; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAS.

    b.   During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. Ann. §§ 35-26, *et seq.* Accordingly, members of the Damages Classes seek all forms of relief available under Conn. Gen. Stat. Ann. §§ 35-26, *et seq.*

216.    **District of Columbia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **D.C. Code Ann. §§ 28-4502, *et seq.*** with respect to purchases of CCAs in the District of Columbia by Class Members and/or purchases by District of Columbia residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    b.  During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D. C. Code Ann. §§ 28-4502, *et seq*. Accordingly, members of the Damages Classes seek all forms of relief available under D. C. Code Ann. §§ 28-4502 *et seq.*

217.    **Illinois:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **740 Ill. Comp. Stat. Ann. 10/1, *et seq.*** with respect ot purchases of CCAs in Illinois by Class Members and/or purchases by Illinois residents.

a.  Defendants' combination or conspiracy had the following effects:  (1) CCA price competition was restrained, suppressed, and eliminated throughout Illinois; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.* Accordingly, members of the Damages Classes seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*

218.  **Iowa:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Iowa Code §§ 553.4, *et seq.*** with respect to purchases of CCAs in Iowa by Class Members and/or purchases by Iowa residents.

a.  Defendants' combination or conspiracy has had the following effects:  (1) CCA price competition was restrained, suppressed, and eliminated throughout Iowa; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) members of the Damages Classes were deprived of free and

open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.4, *et seq.* Accordingly, members of the Damages Classes seek all forms of relief available under Iowa Code §§ 553.4, *et seq.*

219.   **Kansas:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Kan. Stat. Ann. §§ 50-101, *et seq.*** with respect to purchases of CCAs in Kansas by Class Members and/or purchases by Kansas residents.

a. Defendants' combination or conspiracy had the following effects:  (1) CCA price competition was restrained, suppressed, and eliminated throughout Kansas; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* Accordingly, members of the Damages Classes seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq.*

220.  **Maine:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*** with respect to purchases of CCAs by Class members and/or purchases by Maine residents.

a.  Defendants' combination or conspiracy had the following effects:  (1) CCA price competition was restrained, suppressed, and eliminated throughout Maine; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

221.     **Michigan.**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Mich. Comp. Laws Ann. §§ 445.772,** *et seq.* with respect to purchases of CCAs in Michigan by Class Members and/or purchases by Michigan residents.

   a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Michigan; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

   b.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

   c.  As a direct and proximate result of Defendants' conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

   d.  By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Mich. Comp. Laws Ann. §§ 445.772, *et seq.*

222.     **Minnesota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Minn. Stat. §§ 325D.51,** *et seq.* with respect to purchases of CCAs in Minnesota by Class Members and/or purchases by Minnesota residents.

   a.  Defendants' combination or conspiracy had the following effects:  (1) CCA price competition was restrained, suppressed, and eliminated throughout Minnesota; (2)

CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Minn. Stat. §§ 325D.51, *et seq.*

223. **Mississippi:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Miss. Code Ann §§ 75-21-3, *et seq.*** with respect to purchases of CCAs in Mississippi by Class Members and/or purchases by Mississippi residents.

a. Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

94

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-3, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Miss. Code Ann. §§ 75-21-3, *et seq.*

224.   **Nebraska:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Neb. Rev. Stat. §§ 59-801, *et seq.*** with respect to purchases of CCAs in Nebraska by Class Members and/or purchases by Nebraska residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    b.  During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq.* Accordingly, members of

the Damages Classes seek all relief available under Neb. Rev. Stat. §§ 59-801, *et seq.*

225.    **Nevada:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Nev.  Rev. Stat. §§ 598A.060,** *et seq.*  with respect to purchases of CCAs in Nevada by Class Members and/or purchases by Nevada residents.

    a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated through Nevada; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    b.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

    c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants members of the Damages Classes were deprived of free and open competition; and members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    e.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

f.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

g.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. §§ 598A.060, *et seq*. Accordingly, members of the Damages Classes seek all relief available under Nevada Rev. Stat. §§ 598A.060, *et seq.*

226.  **New Hampshire:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.H. Rev. Stat. Ann. §§ 356.2, *et seq.,*** with respect to purchases of CCAs in New Hampshire by Class Members and/or purchases by New Hampshire residents.

a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially inflated prices throughout New Hampshire, (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N. H. Rev. Sta. Ann. §§ 356.2, *et seq*. Accordingly, members

of the Damages Classes seek all relief available under N. H. Rev. Stat. Ann. §§ 356:2, *et seq.*

227.    **New Mexico:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.M. Stat. Ann. §§ 57-1-1,** *et seq.***,** with respect to purchases of CCAs in New Mexico by Class Members and/or purchases by New Mexico residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N. M. Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, members of the Damages Classes seek all relief available under N. M. Stat. Ann. §§ 57-1-1, *et seq.*

228.    **New York:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.Y. Gen. Bus. L. §§ 340,** *et seq.* with respect to purchases of CCAs in New York by Class Members and/or purchases by New York residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout New York; (2)

CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs, or purchased products that were otherwise of lower quality than they would have been absent the conspirators' illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

b.  During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York's Donnelly Act, N.Y. Gen. Bus. L. §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, members of the Damages Classes seek all relief available under New York Gen. Bus. L. §§ 340, *et seq*.

229.  **North Carolina:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.C. Gen. Stat. §§ 75-1, *et seq.***, with respect to purchases of CCAs in North Carolina by Class Members and/or purchases by North Carolina residents.

a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout North Carolina; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N. C. Gen. Stat. §§ 75-1, *et seq.* Accordingly, members of the Damages Classes seek all relief available under N. C. Gen. Stat. §§ 75-1, *et seq.*

230.    **North Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **N.D. Cent. Code §§ 51-08.1-01,** *et seq.***,** with respect to purchases of CCAs in North Dakota by Class Members and/or purchases by North Dakota residents.

a. Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N. D. Cent. Code §§ 51-08/1-01, *et seq.* Accordingly, members of the Damages Classes seek all relief available under N. D. Cent. Code §§ 51-08.1-01, *et seq.*

231.  **Oregon:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Or. Rev. Stat. §§ 646.705,** *et seq.* with respect to purchases of CCAs in Oregon by Class Members and/or purchases by Oregon residents.

a.  Defendants' combination and conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Oregon; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq*. Accordingly, members of the Damages Classes seek all relief available under Or. Rev. Stat. §§ 646.705, *et seq.*

232.  **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **R.I. Gen. Laws §§ 6-36-4,** *et seq.* with respect to purchases of CCAs in Rhode Island by Class Members and/or purchases by Rhode Island residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    b.  During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-4, *et seq*. Accordingly, members of the Damages Classes seek all forms of relief available under R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

233. **South Dakota:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **S.D. Codified Laws §§ 37-1, *et seq.*** with respect to purchases of CCAs in South Dakota by Class Members and/or purchases by South Dakota residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) CCA price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) CCA prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

    b.  During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws §§ 37-1, *et seq*. Accordingly, members of the Damages Classes seek all relief available under S.D. Codified Laws §§ 37-1, *et seq.*

234. **Tennessee:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Tenn. Code Ann. §§ 47-25-101, *et seq.*** with respect to purchases of CCAs in Tennessee by Class Members and/or purchases by South Dakota residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2)

CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c.   As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*. Accordingly, members of the Damages Classes seek all relief available under Tenn. Code Ann. §§ 47-25-101, *et seq*.

235.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of **Utah Code Ann. §§ 76-10-3101, *et seq*.** with respect to purchases of CCAs in Utah by Class Members and/or purchases by Utah residents.

a.   Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Utah Code Ann. §§ 76-10-3101, *et seq.*

236.  **Vermont:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **9 Vt. Stat. Ann. 9 §§ 2453,** *et seq.* with respect to purchases of CCAs by Class Members and/or purchases by Vermont residents.

a.  Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vt. Stat. Ann. §§ 2453, *et seq*. Accordingly, members of the Damages Classes seek all relief available under 9 Vt. Stat. Ann. §§ 2453, *et seq.*

237.  **West Virginia:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **W. Va. Code §§ 47-18-4, *et seq.*** with respect to purchases of CCAs in West Virginia by Class Members and/or purchases by West Virginia residents.

a.  Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W. Va. Code §§ 47-18-1, *et seq*. Accordingly, members of the Damages Classes seek all relief available under W. Va. Code §§ 47-18-1, *et seq.*

238.  **Wisconsin:**  Defendants have entered into an unlawful agreement in restraint of trade in violation of **Wis. Stat. §§ 133.01, *et seq.*** with respect to purchases of CCAs in Wisconsin by Class Members and/or purchases by Wisconsin residents.

a. Defendants' combination or conspiracy had the following effects: (1) CCAs price competition was restrained, suppressed, and eliminated throughout Wisconisn; (2) CCAs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) members of the Damages Classes were deprived of free and open competition; and (4) members of the Damages Classes paid supra-competitive, artificially inflated prices for CCAs.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Wis. Stat. §§ 133.01, *et seq.*

## COUNT III
### Violations of State Consumer Protection Law

239.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

240.    During the Class Period, Defendants engaged in unfair or deceptive acts or practices in violation of the state deceptive trade practices and consumer protection laws pled below.

241.    **Arkansas:**  Defendants have engaged in unfair or deceptive acts or practices in violation of **Ark. Code Ann. § 4-88-107(a)(10)** with respect to purchases of CCAs in Arkansas by Class Members and/or purchases by Arkansas residents.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Arkansas commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10). Accordingly, members of the Damages Classes seek all relief available under Ark. Code Ann. § 4-88-107(a)(10).

242.  **California:**  Defendants have engaged in unfair or deceptive acts or practices in violation of **Cal. Bus. & Prof. Code § 17200,** *et seq.* with respect to purchases of CCAs in California by Class Members and/or purchases by California residents.

a.  Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovative consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on California commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Cal. Bus. & Prof. Code § 17200, *et seq.*

243. **Illinois:** Defendants have engaged in unfair or deceptive acts or practices in violation of **815 Ill. Comp. Stat. Ann. 505/10a,** *et seq.* with respect to purchases of CCAs in Illinois by Class Members and/or purchases by Illinois residents.

    a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

    b. During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

    c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.* Accordingly, members of the Damages Classes seek all relief available under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

244. **Minnesota:** Defendants have engaged in unfair or deceptive acts or practices in violation of **Minn. Stat. § 325F.68,** *et seq.* with respect to purchases of CCAs in Minnesota by Class Members and/or purchases by Minnesota residents.

    a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

    b. During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.68, *et seq.* Accordingly, members of the Damages Classes seek all relief available under Minn. Stat. § 325F.68, *et seq*.

245.  **New Mexico:**  Defendants have engaged in unfair or deceptive acts or practices in violation of **N.M. Stat. Ann. § 57-12-3,** *et seq.* with respect to purchases of CCAs in New Mexico by Class Members and/or purchases by New Mexico residents.

a.  Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b.  During the Class Period, Defendants' illegal conduct had a substantial effect on New Mexico commerce.

c.  As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-3, *et seq.* Accordingly, members of the Damages Classes seek all relief available under N.M. Stat. Ann. § 57-12-3, *et seq*.

246.  **North Carolina:**  Defendants have engaged in unfair or deceptive acts or practices in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.* with respect to purchases of CCAs in North Carolina by Class Members and/or purchases by North Carolina residents.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on North Carolina commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Accordingly, members of the Damages Classes seek all relief available under N.C. Gen. Stat. § 75-1.1, *et seq.*

247. **South Carolina:** Defendants have engaged in unfair or deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10, *et seq.*** with respect to purchases of CCAs in South Carolina by Class Members and/or purchases by South Carolina residents.

a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

b. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*. Accordingly, members

of the Damages Classes seek all relief available under S.C. Code Ann. § 39-5-10, *et seq.*

248.    **Vermont:**  Defendants have engaged in unfair or deceptive acts or practices in violation of **9 Vt. Stat. Ann. § 2453,** *et seq.* with respect to purchases of CCAs in Vermont by Class Members and/or purchases by Vermont residents.

      a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

      b. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

      c. As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

      d. By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of 9 Vt. Stat. Ann. § 2453, *et seq*. Accordingly, members of the Damages Classes seek all relief available 9 Vt. Stat. Ann. § 2453, *et seq*.

249.    **Wisconsin:**  Defendants have engaged in unfair or deceptive acts or practices in violation of **Wisc. Stat. § 100.18,** *et seq.* with respect to purchases of CCAs in Wisconsin by Class Members and/or purchases by Wisconsin residents.

      a. Defendants worked together to fix, raise, maintain, and stabilize the price of CCAs and exercised their collective control to suppress innovation and consumer choice.

      b. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

    c.   As a direct and proximate result of the Defendants' unlawful conduct, members of the Damages Classes have been injured in their business and property and are threatened with further injury.

    d.   By reason of the foregoing, Defendants have engaged in unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.* Accordingly, members of the Damages Classes seek all relief available Wisc. Stat. § 100.18, *et seq*.

**COUNT IV**

**<u>Unjust Enrichment</u>**

250.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

251.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint pursuant to Fed. R. Civ. P. Rule 8(d)(2) & (3).

252.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of CCAs.

253.    Defendants have benefitted from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the other Class Members for CCAs.

254.    Plaintiff and the Damages Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the other Class Members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and other members of the Class may make claims on a pro rata basis.

255.    Pursuit of any remedies against the firms from whom Plaintiff and the Class purchased CCAs subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

113

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes respectfully request the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as representative of the Classes and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and adjudge that acts done in furtherance thereof by Defendants and their co-conspirators were and are a per se violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

C.    That the Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination allege herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    That Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That each of the Defendants, and their respective successors, assigns, parents, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

F.      That the Court award Plaintiff and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## X.    JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: <u>December 27, 2023</u>

*/s Charles J. Kocher*
Charles J. Kocher, Esq.  (Pa. ID 93141)
McOMBER McOMBER & LUBER, P.C.
50 Lake Center Drive, Suite 400
Marlton, NJ 08053
Phone: (856) 985-9800
Fax: (856) 263-2450
cjk@njlegal.com

Heidi M. Silton (*pro hac vice forthcoming*)
Jessica N. Servais (*pro hac vice forthcoming*)
Joseph C. Bourne (*pro hac vice forthcoming*)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

*Attorneys for Plaintiff*